Jurellene **JORMAN, et al., Plaintiffs,**

v.

**VETERANS ADMINISTRATION, et al., Defendants.**

No. 77 C 581.

United States District Court, N.D. Illinois, E.D.

Feb. 3, 1984.

See also D.C., 500 F.Supp. 460.

Jane M. Whicher, Alexander Polikoff & F. Willis Caruso, Chicago, Ill., for plaintiffs.

R. Lawrence Dessem, Sheila Lieber and Ann M. Sheadel, J. Paul McGrath, Asst. U.S. Atty. Gen., Washington, D.C., Daniel K. Webb, U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Six representative plaintiffs remain in this class action against the Veterans Administration and its Administrator (collec-

tively "VA"). Plaintiffs allege VA, through its home mortgage Loan Guaranty Service ("Service"), has caused or contributed to actual and threatened systematic racial transition (in the vernacular, "white flight") in parts of Marquette Park, Chicago, in violation of VA's duty to promote fair housing under Fair Housing Act of 1968 ("Act") § 808(d), 42 U.S.C. § 3608(c) ("Section 3608(c)").

Both sides have now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. Apparently concerned lest plaintiffs' summary judgment affidavits pose factual issues, VA has also moved to strike those affidavits as not meeting the requirements of Rule 56(e). For the reasons stated in this memorandum opinion and order, all three motions are denied, except that plaintiff Edward Keate ("Keate") is dismissed for lack of standing.

### Facts

This action was filed February 18, 1977 by 21 Marquette Park area plaintiffs against both VA and the United States Department of Housing and Urban Development and its Secretary (collectively "HUD"). HUD was dismissed without prejudice October 14, 1977 when it agreed, in connection with its Federal Housing Administration ("FHA") insured mortgage program, to institute a purchaser counseling program intended to promote integration in housing.

On October 3, 1978 plaintiffs filed their Amended Complaint (the "Complaint"). Count I charged VA, through Service, with failing to fulfill its affirmative duty to Marquette Park residents as imposed by Section 3608(c):

All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to

further the purposes of [the Act, 42 U.S.C. §§ 3601–3619] and shall cooperate with the Secretary [of HUD] to further such purposes.

Count II claimed VA had engaged in or condoned housing discrimination or racial steering[1] in violation of various provisions of the Act. As a result of various 1982 dismissals only Count I and six representative plaintiffs remain.[2]

Plaintiffs say Service falls under Section 3608(c)'s phrase "programs and activities relating to housing and urban development." It was established as part of the Servicemen's Readjustment Act of 1944, 58 Stat. 284, and is now codified at 38 U.S.C. §§ 1801–1829. Under Service the VA guarantees 60% of a home loan for any qualifying veteran (up to a $27,500 limit), reducing the down payment that otherwise would have to be made.

VA acknowledges it does not take into account Service's effects on the integrated or segregated condition of the neighborhoods in which it operates. Instead VA points to its efforts to assure Service is operated in a nondiscriminatory manner. Service collects housing discrimination complaints from participating veterans, requires institutional participants such as lenders to certify they do not discriminate, and publicizes those efforts. In addition it analyzes racial, ethnic and gender data collected from participating veterans to assure no groups of veterans are under-represented and institutional participants comply with their certifications of nondiscriminatory practices.

Plaintiffs challenge Service's operation in one area ("Area A") that has experienced white flight in the past decade. Area A is a long (1½ miles), narrow (about ³⁄₁₆ of a mile) tract of residential housing in Marquette Park between a major traffic artery,

---

**1.** "Racial steering" is the practice of directing prospective home purchasers to residences available in neighborhoods predominantly composed of people of the purchasers' own race.

**2.** Plaintiffs voluntarily dismissed Complaint Count II January 19, 1982. On July 23, 1982 the parties stipulated to the dismissal of 14 plain-

tiffs, and this Court dismissed one more December 1, 1982. Plaintiffs now comprise Keate, Jannis Moore ("Moore"), Leonard Judickas ("Judickas"), Mary Ceil McManus ("McManus"), Eva M. Swiontkowski-DeNardis ("Swiontkowski-DeNardis") and Southwest Community Congress ("SCC").

Western Avenue, on the west and a rail corridor on the east.[3] For comparison's sake plaintiffs have designated as "Area B-1" an adjacent and identically shaped tract of housing immediately to the west of Area A.[4] Statistics depict the tumultuous nature of white flight in Area A: During the decade beginning in 1970 its population changed from 4,101 whites and 2 blacks to 535 whites and 4,458 blacks. Over the same decade Area B-1 began with 5,193 whites and 1 black and ended with 5,042 whites and 1 black.

Tables 1–6 in the Appendix set out the statistical underpinning for plaintiffs' argument Service contributed to white flight in Area A. Over the 7 years for which plaintiffs submitted data, the rate of turnover in Area A was 111% (that is, homes were sold an average of 1.11 times per home), while turnover in Area B-1 was 48.5%. Notably in 1976, when 36.9% of the homes in Area A changed hands (compared with 7.6% in Area B-1), VA financed 28.0% of those transactions (compared with 6.8 in Area B-1). Put another way, 1 in 10 homes in Area A changed hands with VA financing in 1976, while at the same time only 1 in 200 homes in Area B-1 changed hands with VA financing.

Many of the plaintiffs reside not in Areas A or B-1 but elsewhere in the area designated "Area B," made up of Area B-1 and most of the Marquette Park community.[5] While the plaintiffs who live or have lived in Area A claim they have experienced white flight and have been injured by it, plaintiffs residing in Area B [6] assert a different concern. They do not now live in an integrated community (their neighborhood is 99.6% white), but they claim fear of white flight and its attendant neighborhood deterioration is an obstacle to integration.

On September 17, 1980 Judge Crowley (in the "Opinion," 500 F.Supp. 460) denied VA's motions to dismiss for lack of standing (Rule 12(b)(1)) and for failure to state a claim upon which relief can be granted (Rule 12(b)(6)). Those denials held plaintiffs had *alleged* the requisite injuries and violations of Section 3608(c). Now that discovery has closed, those issues arise again in *proof* terms: whether there are disputed issues of material fact sufficient to preclude judgment in favor of either side at this time.

### VA's Motion To Strike Affidavits

VA's motion to strike tenders to this Court the singularly uninviting task of combing plaintiffs' affidavits for insufficient showings of personal knowledge and for inadmissible hearsay.[7] VA sets out dozens of examples of passages allegedly defective in those respects, then asks for not just those passages but for all 13 affidavits to be stricken in their entirety. Moreover VA's supporting memorandum (the only one this Court requested) makes no attempt to anticipate even the first and most obvious response any lawyer would make: VA has not addressed which statements not based on personal knowledge are actually helpful statements of opinion or belief based on an adequate factual foundation (see Fed.R.Evid. 701) and, at least as to some affiants, based on expertise (see Fed.R.Evid. 702). Nor has VA addressed which statements reporting declarations by persons other than the affiant were non-hearsay because they were presented for a purpose other than to show the truth of the

---

**3.** Area A is bounded on the north by 63d Street, on the east by Bell Avenue, on the south by 75th Street and on the west by Western Avenue.

**4.** Area B-1 is bounded on the north and south by the same streets as Area A, on the east by Western Avenue and on the west by Maplewood Avenue.

**5.** Area B also lies west of Area A. It is bounded on the north by 55th Street, on the east by Western Avenue, on the south by a line running due west from the southern boundaries of Areas A and B-1, and on the west by Cicero Avenue.

**6.** No named plaintiffs reside in Area B-1.

**7.** VA also charges certain of plaintiffs' materials are irrelevant because they pertain to now-dismissed Complaint Count II. That argument barely deserves a footnote. It would be undue formalism, in an issue before a judge (not a jury), to strike an affidavit rather than pointing out evidence not to be considered because irrelevant.

matter declared (see Fed.R.Evid. 801(c)). Instead VA has cited every (or nearly every) paragraph containing either the word "believe" or its functional equivalent, or any statement of another's declaration, and has provided a dearth of further analysis.

■■■■ VA's motion that all 13 affidavits be stricken in their entirety is denied for three reasons:

1. That motion is formally deficient because its objections sweep much too broadly. In suggesting its objections apply to every word plaintiffs submitted via affidavit, VA stretches beyond the point of credibility any claim it has fulfilled its obligation to "state specifically the portions of the affidavit to which objection is being made, and the grounds therefor." 6 Moore, *Moore's Federal Practice* ¶ 56.-11[1], at 56–1332 (2d ed. 1982). As *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 579 (2d Cir. 1969) so colorfully put it, VA should "do more than swing its bludgeon wildly."

2. Even were the motion well-founded, the appropriate relief would be to strike only parts of the affidavits. While perhaps "the entire affidavit may be disregarded if inadmissible matter is so interwoven or inextricably combined with the admissible portions that it is impossible, in the practical sense, to separate them" (*Southern Concrete Co. v. United States Steel Corp.*, 394 F.Supp. 362, 381 (N.D.Ga.1975)), the mere assertion of that proposition does not make it applicable here. VA may rest assured this Court will consider neither inadmissible matter nor matter "inextricably combined" with inadmissible matter.

3. This Court has already stated its ultimate conclusion summary judgment is inappropriate for either side, except as to Keate's obvious lack of standing. In that light judicial (and litigants') economy precludes issuance of an order forcing affidavits to be recast to cure merely formal deficiencies.[8] And clearly an opportunity to cure would be appropriate before foreclosing a formally deficient party's rights. Although *Gordon v. Watson*, 622 F.2d 120 (5th Cir.1980) concerned the failure of a pro se litigant to comply with the Rule 56(e) standards, its reasoning applies equally here (*id.* at 123):

> Summary judgment is an excellent device by which district courts may make expedited dispositions of those cases in which a trial would be fruitless. When summary judgment is inappropriate because the supporting or opposing materials are improper, the district court has ample discretion to call upon the parties to remedy the defects, by submitting supplemental affidavits or otherwise.

For the present, then, formal deficiencies may be ignored.[9]

### Standing

■■■■ VA attacks the sufficiency of plaintiffs' evidence supporting their standing to enforce the Act, while conversely

---

**8.** VA's principal technical claims are these:

    1. Most of the affidavits recite "the statements made therein are true based on my personal knowledge, except those statements which are made on information and belief" (or some functional equivalent).

    2. Plaintiffs fail to attach sworn or certified copies of all documents referred to in the affidavits.

Both arguments are singularly unpersuasive:

    1. Rule 56(e) of course requires affidavits to be made on personal knowledge. But when *opinion* evidence is at issue, "belief" *is* the requisite "knowledge"—it is up to the factfinder to determine whether the opinion is to be credited and what weight is to be given the opinion. That renders inapt VA's citations generally, and particularly *F.S. Bowen Electric Co. v. J.D. Hedin Construction Co.*, 316 F.2d 362, 364 (D.C.Cir.1963) (where the affidavits actually disclaimed personal knowledge of the averments).

    2. Each affidavit is sworn to and describes each document attached. As our Court of Appeals stated in *First National Bank Co. of Clinton, Ill. v. Ins. Co. of North America*, 606 F.2d 760, 766 (7th Cir.1979) (citations omitted):

> In proceedings under rule 56(c), documents and exhibits identified by affidavit may be submitted to support a motion for summary judgment.

**9.** That applies to VA as well, for of course its own presentation is unable to meet the stringent and unrealistic standards to which it holds plaintiffs.

plaintiffs argue the evidence confirms their standing as a matter of law.[10] *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) recently summarized the "irreducible minimum" constitutional standing requirements:

> Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

There are also prudential limitations on the exercise of federal jurisdiction—limitations the Opinion, 500 F.Supp. at 463–64 found inapplicable to this case.

■ Although the parties have addressed the standing requirements as threefold—injury, causation and redressability—the most problematic to plaintiffs is that of causation. Indeed, if causation is not shown they cannot establish injury and redressability either. As for injury, whatever injury plaintiffs assert must be "as a result of the putatively illegal conduct of the defendant." If the injury is only threatened, as in the case of plaintiffs residing in Area B, their subjective fear of injury does not qualify as an injury unless it actually is caused by VA. As *City of Los Angeles v. Lyons,* — U.S. ——, 103 S.Ct. 1660, 1668 n. 8, 75 L.Ed.2d 675 (1983) (emphasis in original) put it:

> It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.

And as for redressability, if VA did not cause the injury by act or omission it almost certainly cannot prevent or cure the injury by some other act or omission.

■ To show causation plaintiffs must show their injury "fairly can be traced to the challenged action." Plainly that turns on disputed questions of material fact. Plaintiffs' statistics (set forth in the Appendix) show VA financing of persons engaged in white flight from Area A. While those statistics are undisputed except as to the manner of their presentation, the *correlation* they demonstrate does not in this case establish *causation.*

■ Plaintiffs' experts argue Area A was the victim of a massive influx of federal money in support of the evacuation of whites from the area.[11] VA's experts

---

**10.** Typically standing can be resolved on the pleadings. If it is found at trial plaintiff suffered no injury at defendant's hands, the claim is dismissed on the merits rather than because of the absence of a case or controversy. Here however a showing plaintiffs were not injured does not necessarily establish VA was in compliance with Section 3608(c) as to plaintiffs. Conceivably VA could be in breach of its statutory duties even though plaintiffs were not injured thereby. In such a situation a finding of liability would be an impermissible advisory opinion, while dismissal on the merits would wrongly imply VA is in compliance with its duties. Accordingly the proper course of action would be to dismiss the case for lack of standing. Hence the cryptic footnote in *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 1616 n. 31, 60 L.Ed.2d 66 (1979). In general the rule is this:

> 1. Where (as in most cases) plaintiff claims defendant breached a duty running to him or her directly, that allegation suffices.

> 2. Where plaintiff claims defendant breached a generalized duty to the community or some other amorphous group, plaintiff must demonstrate with evidence his or her entitlement to sue under Const. art. III.

**11.** Both in support of its motion to strike affidavits (Mem. 7 & 7–8 n. *) and in support of summary judgment (R.Mem. 7 n. *) VA argues plaintiffs' expert testimony should be disregarded. This Court's duty is to draw all reasonable inferences in favor of the nonmoving party. That duty would be breached by total rejection of expert testimony and investigations on which it is based, simply because (as VA urges, Motion to Strike Mem. 8 n. *) there are assertedly "serious questions as to ... reliability and impartiality." And VA's citation (*id.*) to *Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir. 1980) for the proposition surveys and statistics are inadmissible hearsay is not even colorable— frankly it is baffling.

respond withholding VA funds would not have slowed, much less prevented, white flight. They argue plaintiffs have (1) overestimated the facilitating effect of VA guaranties on real estate transactions and (2) underestimated the power of the biases of individuals who create housing segregation in the first instance.[12]

Existence of a material factual issue as to causation precludes judgment for plaintiffs. Half the battle on the current motions is thus ended. But VA could still win summary judgment if it shows one of the other elements of standing is absent as a matter of law. This opinion turns then to that inquiry.

Each named plaintiff has shown the first element: actual or threatened injury sufficient to raise a triable issue. Moore, a black residing in Area A, claims various specific deprivations of "social and professional benefits of living in an integrated society" (*Gladstone*, 441 U.S. at 98, 99 S.Ct. at 1607): deterioration of neighborhood businesses, city services and home resale value.[13] Keate, a white who moved from Area A to the suburbs after this action was filed (doing so because of racial incidents directed at him and his family), sold his home at a loss and now rents. Those verified claims obviously are a sufficient basis on which to go to trial, despite VA's arguments (1) Area A is still "pleasant"[14] and (2) Keate's loss on the sale of his home was suffered due to his own negligence.[15]

All the remaining plaintiffs, who reside in Area B, rely on showings of threatened rather than actual injury. As with the more generalized issue of causation, the experts have joined issue on whether there is a real threat the white flight phenomenon will cross Western Avenue to invade Area B. Thus the standing of the Area B plaintiffs also raises disputed issues of material fact—unless of course the threat of injury, even as depicted by plaintiffs' experts, is not "real and immediate" as required by *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974).

White flight does not present an "immediate" threat to any Area B plaintiff as that term is used in everyday language. During the 10 years studied by plaintiffs' experts, the line of demarcation between black and white neighborhoods has moved only three blocks west. While the experts disagree on whether that westward pace will quicken or slow in the future, it cannot be disputed the boundaries of white flight have (at least until now) moved at a glacial pace. Of the Area B plaintiffs, Swiontkowski-DeNardis lives 8½ blocks west of Western Avenue; Judickas, 17 blocks; and McManus, 20½ blocks.[16] Thus the threat white flight will invade the blocks on which Area B plaintiffs live is (at least on the

---

**12.** Even had the experts not confronted each other's testimony so head-on, two factors counsel against summary judgment based on experts' affidavits:

1. Neither side's experts have been cross-examined on the contents of their affidavits, all executed after the close of discovery. According to 6 Moore, *Moore's Federal Practice* ¶ 56.15[4], at 56–514 (footnote omitted):

On the whole, affidavits are the least satisfactory form of evidentiary materials upon which to base a summary judgment.

2. Expert testimony, like all opinion testimony, presents issues of credibility best resolved at trial. See *id.* at 56–528 to –529; *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627–29, 64 S.Ct. 724, 728–30, 88 L.Ed. 967 (1944).

**13.** VA R.Mem. 5 argues Area B plaintiffs were not injured because their homes have appreciated, while R.Mem. 11 simultaneously argues

Moore was not injured because her home has not depreciated. This combination of arguments is no doubt part of the constantly-expanding universe theory encountered in physics.

**14.** While *Simon* does require plaintiff to show "distinct and palpable injury" (426 U.S. at 38, 96 S.Ct. at 1924), it is perhaps taking that holding too far to suggest if segregation *improves* an area, any illegal actions causing that segregation should be immune from redress.

**15.** Contributory negligence as a possible defense to the cognizability of Keate's injury poses a novel legal issue. However, given Keate's dismissal on other grounds, it need not be addressed.

**16.** SCC, the organizational plaintiff, purports to represent all of Marquette Park, and both sides agree its standing is derivative of that of the other named plaintiffs.

present showing) a long-term one that must be measured in years.

But *temporal* immediacy is not the hallmark of what is "immediate" in the legal sense. Cases such as *Lyons* and *O'Shea*, which were dismissed on standing grounds because the threat of injury was not "immediate," did not suffer such dismissal because the injury was too far in the future or too slow in its operation. Rather the lack of "immediacy" simply meant plaintiffs were no more in danger of harm than any of a large class of persons—the populace generally. By contrast here, according to plaintiffs' experts, Area B plaintiffs live in a part of Chicago in much greater danger of injury from white flight than most other areas. Accordingly the slow pace of white flight is not alone sufficient to defeat standing.[17]

Redressability, the final element of standing, also presents a material factual issue as to all but one plaintiff. Only Keate fails on this score.

VA misconstrues the redressability requirement as meaning that if the prospect of framing an injunctive decree presents knotty workability problems, plaintiffs have no standing. That position is not supported by *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973),[18] a child support case. There the Supreme Court assumed for its analysis the decree sought by plaintiff would be effective (in the sense it would lead to prosecution of defendant) but found that result would not necessarily remedy the asserted wrong (defendant's failure to pay child support). If a decree actually is unworkable, this Court can decline to enter

one for prudential reasons without denying standing in the first instance.[19]

VA argues *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) requires dismissal for want of redressability because there as here action by defendants alone could not redress the injury claimed. *Warth* held citizens have no standing to challenge allegedly exclusionary zoning practices of a neighboring community. Both in *Warth* and here the situation can be corrected only if nonparties enter into real estate transactions, though defendants in each case were or are empowered to regulate the nature of those transactions.

While that aspect of the cases is parallel, it is equally clear the need for third party participation in real estate transactions at issue does not alone prevent standing. *Gladstone*, which permitted community residents to challenge racial steering by realtors, illustrates the point. *Gladstone* survived while *Warth* did not because the *Warth* plaintiffs sought to assert the rights of the third parties, while *Gladstone* plaintiffs asserted their own rights to an integrated community. *Gladstone* (not *Warth*) controls here because plaintiffs are asserting their own rights under Section 3608(c), not the rights of veterans seeking loans from the Service.

Keate's situation however is different. He has moved from Area A to the suburbs. Consequently not even complete integration of Marquette Park could remedy the wrong he claims to have suffered. It could be he is in danger of white flight where he now lives, but there has been no showing

---

**17.** As an alternative argument for Area B plaintiffs' standing, plaintiffs present opinion evidence that white flight in Area A currently prevents integration of Area B. While that claimed causal chain is more attenuated, it is a material fact issue plaintiffs are entitled to address at trial.

**18.** *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 79 n. 24, 98 S.Ct. 2620, 2633 n. 24, 57 L.Ed.2d 595 (1978) said there was no standing in *Linda R.S.* "because of the unlikelihood that the relief requested would redress appellant's claimed injury."

**19.** While both sides address redressability as one of three elements of standing, that view is really not borne out by examination of the relevant case law. Generally the Supreme Court uses a finding of no redressability as a way of illustrating the lack of causal relationship between the injury asserted and the underlying illegal conduct. *See, e.g., Simon*, 426 U.S. at 42–46, 96 S.Ct. at 1926–1928; *Warth v. Seldin*, 422 U.S. 490, 504–08, 95 S.Ct. 2197, 2208–10, 45 L.Ed.2d 343 (1975). Even in *Linda R.S.* the injury would have been redressable had plaintiff proved defendant did not pay child support because he had not been criminally prosecuted.

to that effect. His position thus is indistinguishable from that of the plaintiff who was the victim of a police "chokehold" in *Lyons:* He claims to have suffered an injury in the past, but his suit seeks only prospective injunctive relief, and he is no more likely to be reinjured than anyone else in the metropolitan area is likely to be injured in the first place.

In summary, every element of standing—injury, causation and redressability—is materially disputed as to every named plaintiff except Keate. Keate plainly has no standing because this suit seeks only prospective relief and only in Marquette Park, where Keate no longer lives.

### Section 3608(c) Applicability

As was true of standing, the propriety of imposing a duty on Service under Section 3608(c) turns on the nature and extent of the relationship between Service's activities and white flight. For that purpose it is appropriate to turn to the virtually identical fair housing duty imposed on VA by Section 3608(c) and on HUD itself by Act § 808(e)(5), 42 U.S.C. § 3608(d)(5) ("Section 3608(d)(5)").[20] As to the latter the leading case is *Shannon v. HUD*, 436 F.2d 809, 821 (3d Cir.1970), which held HUD "must utilize some institutionalized method whereby, in considering site selection or type selection, it has before it the relevant racial and socioeconomic information necessary for compliance with its duties under the 1964 and 1968 Civil Rights Acts."[21] Plaintiffs similarly seek to require VA to adopt an "institutionalized method" of data collection.

Plaintiffs brought this action not under the Act directly as authorized by Section 810, 42 U.S.C. § 3610 (see *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)) or Section 812, 42 U.S.C. § 3612 (see *Gladstone*), but rather under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. VA admittedly does nothing to monitor or regulate the effects of its Service on the integration or segregation of neighborhoods. Under the APA that decision by VA is subject to reversal and a declaration of unlawfulness if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).[22]

As an initial matter, Section 3608(c) clearly applies to Service. That section addresses "programs and activities relating to housing and urban development." *City of Camden v. Plotkin*, 466 F.Supp. 44, 53–54 (D.N.J.1978), perhaps the only reported decision (other than the Opinion in this case) ever to construe Section 3608(c), declined to apply it to the Census Bureau because (*id.* at 54) there was "no allegation of direct involvement ... in a housing project." No such threshold problem is posed here. By any standard Service is engaged in "activities relating to housing." Instead the real issue is the extent of the duties imposed by Section 3608(c).

VA's arguments against imposition of a *Shannon*-type duty can be framed in the form of three contentions:

    1. Section 3608(c)'s statement of duty is so vague and broad, *any* fair housing efforts by the Service fulfill it.

---

**20.** Section 3608(d)(5) provides:
    (d) The Secretary of Housing and Urban Development shall

         *      *      *      *      *      *

    (5) Administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [42 U.S.C. §§ 3601–3619].
Those policies, referred to by both Section 3608(c) and Section 3608(d)(5), are embodied in Act § 801, 42 U.S.C. § 3601 ("Section 3601"): It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

**21.** *Shannon,* 436 F.2d at 820 found those Civil Rights Acts exemplified the meaning of "fair housing" in Section 3601.

**22.** When a court reviews an agency's lack of procedures under the APA, it of course builds its own factual record—for it cannot review a non-existent administrative record. That principle is applied to a review of HUD's obligations under Section 3608(d)(5) in *Montgomery Improvement Ass'n v. HUD,* 543 F.Supp. 603, 606 (M.D. Ala.1982).

2. VA has no discretion to impose requirements on applicants other than those expressly set forth in the underlying statute, 38 U.S.C. §§ 1801–1829.

3. Because of the nature of Service's activities, its effect on integration is not "an important aspect of the problem" that it "entirely failed to consider," *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

Although the third contention presents a disputed issue of material fact (enough to defeat summary judgment), the first two do not.

VA rests its first argument on an unsound foundation: cases showing statutes setting forth general housing goals do not give rise to specific obligations. For instance, *Acevedo v. Nassau County,* 500 F.2d 1078, 1082 (2d Cir.1974) held Section 3608(d)(5) does not require agencies to assure residential housing is located near sites at which many federal employees will work. Similarly *Alexander v. HUD,* 555 F.2d 166, 171 (7th Cir.1977), *cert. denied,* 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979) held Congress' declaration of housing policy in 42 U.S.C. § 1441 ("Section 1441") does not imply a warranty of habitability to tenants of the United States government.

Those cases however are only examples of situations in which those statutes do not apply. Cases on the other side of the issue—more directly applicable here—are far weightier. *Trafficante* and *Gladstone* certainly suggest the Act should be viewed generously. *Alschuler v. HUD,* 686 F.2d 472, 476–82 (7th Cir.1982) permitted review of HUD public housing site selection under Section 3608(d)(5). And *United States v. Winthrop Towers,* 628 F.2d 1028, 1034–36 (7th Cir.1980) permitted review of HUD mortgage foreclosure under Section 1441. By analogy Section 3608(c), like Sections 3608(d)(5) and 1441, is surely more than precatory in terms of judicial enforceability.

■ Not only has the foundation for VA's first contention collapsed, but its su-

perstructure is unsound as well. VA argued from *Clients' Council v. Pierce,* 532 F.Supp. 563, 576–77 (W.D.Ark.1982), that "myriad efforts to promote fair housing" can overcome apparent neglect of duties in other areas. But since VA filed its initial brief the Eighth Circuit reversed (711 F.2d 1406 (8th Cir.1983)), summarily finding a constitutional violation and remanding only to determine a remedy. While the Court of Appeals did not deal expressly with the District Court's finding of compliance in other areas, it did state (*id.* at 1425):

> Because we have found HUD liable for a constitutional violation, it certainly cannot have met its responsibility [under Section 3608(d)(5) ] to promote fair housing.

Thus Service's anti-discrimination efforts cannot alone meet its Section 3608(c) obligations if its failure to consider its effects on neighborhood integration is itself a violation of that Section.

■ VA's second contention rests on the premise Service operates in a nondiscretionary manner and therefore is not entitled to withhold mortgage guaranties from veterans to promote fair housing. Judge Crowley's Opinion disposed of that premise, 500 F.Supp. at 463:

> [38 U.S.C.] Section 1804(d) belies the rigidity which defendant would read into the statutory duty of the Veterans Administration. Because the VA may consider whether a prospective applicant or lender has "engaged in practices … detrimental to the interests of veterans or of the government," it is responsible as an "executive agency" to the requirements of § 808(d) of the Fair Housing Act, 42 U.S.C. § 3608(c).

VA's citation to *Wells v. Administrator of Veterans Affairs,* 537 F.Supp. 473 (E.D.N.Y.1982) is inapposite. Although that case does say (*id.* at 477) "the VA has no statutory mandate, implied or expressed, to promote the betterment of neighborhoods," that was said only in the sense that VA has no duty to maintain homes it acquires by foreclosure as rental units. *Wells* simply declined to expand Service into the rental business, but it did not address whether

**1418**

Service conducts or should conduct its current statutory activities to promote fair housing.[23]

▮ Only VA's final contention requires factual development at trial. It argues its decision not to consider Service's effects on neighborhood integration is not arbitrary and capricious under the APA. As *Motor Vehicle Manufacturers* recently said (103 S.Ct. at 2867), an agency's failure to consider data is arbitrary and capricious if it entirely fails "to consider an important aspect of the problem."

▮ Plaintiffs build a convincing argument neighborhood integration generally is an important aspect of administration of housing programs. First they show the Act was designed to promote integration as well as other goals. That is by no means self-evident from a mere reading of Sections 3601 and 3608(c), which speak only in terms of "fair housing." But when introducing the Act as a bill in the Senate, Senator Mondale not only suggested the Act was intended to promote integration but also blamed VA for white flight. Immediately after World War II, he said (114 Cong. Rec. 2278 (1968)), "the FHA, the VA, and other Federal agencies encouraged, assisted, and made easy the flight of white people from the central cities of white America, leaving behind only the Negroes and others unable to take advantage of these liberalized extensions of credits and credit guarantees."[24]

Case law also supports integration as a goal of the Act. *Shannon* led the way in that respect, finding (436 F.2d at 820) the Housing Act of 1949 required only nondiscriminatory disbursement of benefits, but by 1968 the Act required administration of housing programs in a manner that would promote integration. *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1133 (2d Cir.1973) followed:

> We agree with the parties and with the district court that the [New York City Housing] Authority is under an obligation to act affirmatively to achieve integration in housing. The source of that duty is both constitutional and statutory.

*See also Alschuler*, 686 F.2d at 475 n. 1.

Just because integration is a goal of the Act, however, does not mean it is an "important aspect" of the problem of administering Service. As discussed above it is hotly disputed whether Service has in any way promoted white flight in Area A. For plaintiffs to have standing they must show injuries stemming from white flight are "fairly traceable" to Service. In like manner, for plaintiffs to prevail on the merits they must show effect on neighborhood integration is "an important aspect of the problem" of administering Service. This Court need not now decide just what quantum of proof would succeed under each of these standards. What controls on the current motions is that either side could still prevail on both.

### Conclusion

In light of the diametrically opposing opinions of plaintiffs' and VA's experts, summary judgment for either side is plainly inappropriate here. Both Rule 56 motions are denied. VA's attempt to tip the balance in its favor by moving to strike all of plaintiffs' affidavits fails as well, and that motion too is denied. Because the evidence reveals plaintiff Keate has no standing as a matter of law, he is dismissed from the case.

---

**23.** Another factor perhaps operating in *Wells* is that statements of goals and policies in federal housing statutes are not intended to serve as a basis for landlord-tenant relationships in which the United States government is the landlord. *See Alexander*, 555 F.2d at 171.

**24.** Ironically plaintiffs now blame VA for the effects of its financing blacks—not, as after World War II, whites. Plaintiffs accuse VA not of guaranteeing credit to whites fleeing the city, but rather of guaranteeing credit to blacks seeking to buy homes as the whites leave.

### TABLE #1
### REAL ESTATE TRANSACTIONS IN AREA A

|  | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | SEVEN YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|
| TOTAL TRANSACTIONS | 56 | 134 | 397 | 317 | 158 | 93 | 39 | 1194 |
| FHA TRANSACTIONS | 7 | 21 | 132 | 64 | 3 | 2 | 7 | 236 |
| VA TRANSACTIONS | 2 | 38 | 111 | 74 | 29 | 18 | 12 | 284 |

### TABLE #2
### VA AND FHA AS A PERCENT OF ALL TRANSACTIONS IN AREA A

|  | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | SEVEN YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|
| PERCENT FHA | 12.5 | 15.7 | 33.2 | 20.2 | 1.9 | 2.2 | 17.9 | 19.8 |
| PERCENT VA | 3.6 | 28.4 | 28.0 | 23.2 | 18.4 | 19.4 | 30.8 | 23.8 |
| TOTAL VA AND FHA | 16.1 | 44.0 | 61.2 | 43.5 | 20.3 | 21.5 | 48.7 | 43.6 |

### TABLE #3
### PERCENT TURNOVER (TRANSACTIONS AS A PERCENT OF THE 1076 RESIDENTIAL PROPERTIES IN AREA A)

|  | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | SEVEN YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|
| TOTAL PERCENT TURNOVER | 5.2 | 12.5 | 36.9 | 29.5 | 14.7 | 8.6 | 3.6 | 111.0 |
| FHA PERCENT TURNOVER | 0.7 | 2.0 | 12.3 | 5.9 | 0.3 | 0.2 | 0.7 | 21.9 |
| VA PERCENT TURNOVER | 0.2 | 3.5 | 10.3 | 6.9 | 2.7 | 1.7 | 1.1 | 26.3 |

### TABLE #4
### REAL ESTATE TRANSACTIONS IN AREA B–1

|  | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | SEVEN YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|
| TOTAL TRANSACTIONS | 37 | 83 | 88 | 106 | 113 | 86 | 52 | 565 |
| FHA TRANSACTIONS | 3 | 2 | 3 | 0 | 2 | 0 | 3 | 13 |
| VA TRANSACTIONS | 2 | 18 | 6 | 4 | 17 | 10 | 12 | 69 |

### TABLE #5
### VA AND FHA AS A PERCENT OF ALL TRANSACTIONS IN AREA B–1

|  | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | SEVEN YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|
| PERCENT FHA | 8.1 | 2.4 | 3.4 | 0.0 | 1.8 | 0.0 | 5.8 | 2.3 |
| PERCENT VA | 5.4 | 21.7 | 6.8 | 3.8 | 15.0 | 11.6 | 23.1 | 12.2 |
| TOTAL VA AND FMA | 13.5 | 24.1 | 10.2 | 3.8 | 16.8 | 11.6 | 28.8 | 14.5 |

### TABLE #6
### PERCENT TURNOVER (TRANSACTIONS AS A PERCENT OF THE 1165 RESIDENTIAL PROPERTIES IN AREA B–1)

|  | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | SEVEN YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|
| TOTAL PERCENT TURNOVER | 3.2 | 7.1 | 7.6 | 9.1 | 9.7 | 7.4 | 4.5 | 48.5 |
| FHA PERCENT TURNOVER | 0.3 | 0.2 | 0.3 | 0.0 | 0.2 | 0.0 | 0.3 | 1.1 |
| VA PERCENT TURNOVER | 0.2 | 1.5 | 0.5 | 0.3 | 1.5 | 0.9 | 1.0 | 5.9 |