**Jurellene JORMAN, et al.,**
**Plaintiffs-Appellants,**

v.

**VETERANS ADMINISTRATION, and Harry N. Walters, Administrator,**
**Defendants-Appellees.**

**No. 86–2933.**

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1987.

Decided Sept. 21, 1987.

Rehearing Denied Dec. 9, 1987.

Alexander Polikoff, B.P.I., Chicago, Ill., for plaintiffs-appellants.

Bruce G. Forrest, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before BAUER, Chief Judge, CUDAHY and FLAUM, Circuit Judges.

BAUER, Chief Judge.

More than thirty years since *Brown v. Bd. of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) mandated integrated schooling, integrated housing is still a frustratingly elusive goal. Chicago remains a city largely divided along racial lines. In the 1970's, a segregated all-white Chicago neighborhood became a segregated all-black neighborhood. The causes behind this disturbing phenomenon, coined "resegregation," are numerous and complex. This class action was initiated in 1977 by residents of that neighborhood, charging that the Department of Housing and Urban Development through the Federal Housing Administration ("FHA") and the Veterans Administration ("VA") had failed to adequately monitor the effects of their respective home-loan guarantee programs, paving the way for resegregation. After the FHA was dismissed without prejudice, the only remaining defendants were the VA and its administrator. The district court, in a thorough and well-reasoned order, found that the plaintiffs lacked standing to sue because their injuries were not "fairly traceable" to defendants' failure to monitor its program, 654 F.Supp. 748; we affirm.

I.

Marquette Park is located on the southwest side of Chicago. In the 1970's, a portion of Marquette Park (Area A), experienced "tumultuous" white flight and subsequent resegregation. *See Jorman v. Veterans Administration*, 579 F.Supp. 1407, 1411 (N.D.Ill.1984). For the purposes of this litigation, Area A is a roughly 36–block area, bordered by Western Avenue; the remainder of Marquette Park has been designated Area B.[1] In 1975, the first black families began to move into Area A. Between 1975 and 1978, there was a flurry of real estate activity in the area, including houses sold with the assistance of mortgages insured by the VA and FHA. During that time, ninety percent of the homes in Area A changed hands. Ninety-six percent of the houses sold were sold to black purchasers. Before 1975, Area A had a five percent annual turnover rate, in 1976, Area A had a thirty-seven percent turnover rate. By 1980, Area A had become a segregated all-black community. Area B was

---

1. A portion of Area B was designated Area B–1 below for statistical comparison to Area A.

Area B–1 is roughly the same geographic size and population as Area A.

approximately ninety-nine percent white until 1980. Since then, some 15–18 black families have moved into Area B.

The class action, as filed, had twenty-one members in the plaintiff class. Seventeen members have since been dismissed. The remaining four class members are Jannis Moore Willaby, Mary Ceil McManus, Leonard Judickas and the Southwest Community Congress ("SCC"). Willaby, McManus and Judickas are all homeowners in Marquette Park (Willaby in Area A and McManus and Judickas in Area B); the Southwest Community Congress is a nonprofit neighborhood organization. Plaintiffs filed their complaint on February 18, 1977, charging that neither the VA nor the FHA adequately monitored and regulated the effects of their home loan mortgage programs on neighborhood racial composition. In particular, plaintiffs complained about the agencies' failure to institute a prepurchase counseling program designed to advise prospective black buyers of alternative housing in neighborhoods without a potential for resegregation. Plaintiffs contended that the agencies should have had a method for collecting and analyzing data on particular neighborhoods. Plaintiffs argue that a prepurchase counseling plan, guided by this data, would have decreased blacks' demand for housing in areas with a potential for resegregation and would have prevented white flight. There is no dispute that neither agency had any such program, nor any method for monitoring the changing racial composition in a given area.

In addition, plaintiffs challenged the agencies' practice of pre-approving mortgages (termed "John Doe" appraisals in the VA and "conditional commitments" in the FHA), the VA's practice of encouraging use of their loan programs in the inner-city, and the procedures used by both agencies to appraise the value of homes. Plaintiffs charged that the failure to monitor community racial composition and adjust their lending practices accordingly contravened the agencies' statutory duty under 42 U.S.C. § 3608(d) to administer housing programs "in a manner affirmatively to further the purposes" of Title VIII of the 1968 Civil Rights Act. A later complaint also charged a violation of the agencies' duties imposed by 42 U.S.C. § 1441, which provides that "agencies of the Federal Government having powers, functions or duties with respect to housing, shall exercise their powers, functions and duties ... in such manner as will encourage and assist ... the development of well-planned, integrated, residential neighborhoods...."

In a second count, the plaintiffs charged that the VA and the FHA knowingly condoned various discriminatory practices. Count II was dismissed on January 19, 1982, for failure to allege any facts to support the allegations. The FHA was dismissed without prejudice on October 14, 1977 after agreeing to institute a prepurchase counseling program designed to promote housing integration. Throughout the litigation, plaintiffs sought to compel the agencies to change their practices: to cease preapproving mortgages and to institute a prepurchase counseling program. In addition, plaintiffs now seek to have the VA offer current residents of Area A alternative housing in nonsegregated communities.[2]

The Veterans Administration home loan guaranty program was established to help ex-servicemen purchase homes. Under the program, the VA guarantees sixty percent of the loan up to a ceiling of $27,500 (currently). As a result, private lenders are more willing to finance a mortgage than they otherwise might be. In the late 1960's, the VA encountered pressure from civil rights groups to encourage the use of their loan program by minorities in the

---

**2.** Plaintiffs apparently did not present the latter remedy below. Since the hearing below was limited to the issue of liability, plaintiffs erroneously concluded that the issue of remedies would not be addressed. Redressability, however, the third requisite of standing, turns on the availability of a judicial remedy. *See Allen v. Wright,* 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984). All available remedies were therefore relevant to a determination regarding redressability and should have been presented below. Since we determine that plaintiffs failed to show the necessary causation, we do not address redressability.

inner city. Thus, in 1968, the VA ceased excluding inner-city areas from those in which it would guarantee mortgages for qualified veterans.

Plaintiffs' primary expert, Dr. Calvin Bradford, a senior fellow at the Hubert Humphrey Institute of Public Affairs at the University of Minnesota, testified that the rapid resegregation of Area A was caused by the infusion of FHA and VA lending in the area. This conclusion was corroborated by plaintiffs' other expert who testified that a financing mechanism that allows for rapid turnover is crucial for resegregation.

Defendants' expert, Dr. Brian Berry, Dean of the School of Urban and Public Affairs at Carnegie-Mellon University, testified that rather than causing resegregation, the influx of government-assisted loans was merely a symptom that tends to accompany resegregation.[3] Dr. Berry attributed the resegregation phenomenon to the fears of many white homeowners that their property values would decline if the level of integration surpassed a certain point. In addition, Dr. Berry pointed to the fears of many white homeowners that living in an integrated neighborhood would result in a loss of "status". According to Dr. Berry's research, white homeowners would tolerate only a 20% level of minorities before these fears would surface.

The district court largely credited defendant's expert over plaintiffs' and found that plaintiffs lacked standing to sue because the injuries suffered were not "fairly traceable" to VA practices and because plaintiffs could not show that their injuries were likely to be redressed by a favorable decision. In doing so, the district court noted that "to conclude [that VA practices caused the resegregation of Area A] would require the Court to engage in the specula-

tive leaps of faith prohibited by the Supreme Court...." (Mem.Op. at 37). The Court noted that resegregation fundamentally was caused by blacks' desires to find better housing in the city, coupled with whites' intolerance of a certain level of minority population. The court found that the defendants' expert, Dr. Berry, presented a more plausible explanation of increased black demand and white flight than did plaintiffs' experts and that the increased availability of government-assisted mortgages was a symptom, rather than a cause, of resegregation. Accepting Dr. Berry's findings that white homeowners tolerate only a 20% minority level, the court noted that even in the absence of any government-assisted financing, Area A would have become at least 60% black.[4]

As to specific practices of the VA, the court found insufficient evidence from which to conclude that John Doe appraisals played a significant role in the resegregation process. It found further that the effects of a prepurchase counseling program could not be measured since the plaintiffs had failed to show that conventional mortgages were unavailable at the time. The court therefore concluded that resegregation would have occurred "at almost the same pace" even if no VA-guaranteed loans had been extended during the 1970's. The district court also found that plaintiffs' injuries could not be redressed by the court, reasoning that instituting a prepurchase counseling program and eliminating the use of John Doe appraisals would not affect the lives of those in Marquette Park now forced to live in a resegregated community.[5]

Plaintiffs make three basic arguments on appeal. First, they argue that the district court erroneously viewed the effects of VA loans in isolation from the effects of FHA

---

3. Dr. Berry noted that "[t]o state that one of the causes is a rapid rate of turnover is basically a tautology, because rapid change is defined as ... many properties changing hands." (Tr. 922)

4. The court also noted that when VA financing alone was subtracted, Area A would have become 75–80% black (the total number of homes sold between 1975 and 1980 through conventional FHA-assisted mortgages).

5. The court's finding on redressability did not distinguish between residents of Area A (living under resegregation) and residents of Area B (living under the threat of resegregation). Again, we do not address the propriety of this finding.

loans to determine whether plaintiffs' injuries were fairly traceable to the defendants' actions. Second, they argue that in finding that their injuries were not fairly traceable to acts of the VA, the district court ignored evidence which showed that unmonitored government lending exacerbated whites' fears of resegregation and that prepurchase counseling could reduce blacks' demand for housing in the area and generally decelerate the process.[6] Third, plaintiffs attack the district court's adverse finding on the third element of standing, redressability. We find that the district court properly assessed the effects of VA action alone. Because we find that the district court properly found that plaintiffs' injuries were not "fairly traceable" to defendant's actions, we do not reach the redressability issue.

## II.

■■■ The power of the judiciary is limited to deciding actual controversies between litigants. Plaintiffs seeking redress in the courts are required to present a concrete injury. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Concepts such as standing, mootness and ripeness assure that cases will be litigated by those having an actual stake in the outcome and that decisions will be made in an arena of real and substantial problems to be redressed by specific solutions. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. Standing, in particular, confines federal judicial power "to a role consistent with a system of separated powers and [to issues] which are traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). Therefore, before a plaintiff can invoke the

jurisdiction of the judiciary it must show (1) an actual or threatened injury; (2) an injury that is "fairly traceable" to the conduct; and (3) an injury that is likely to be redressed by a favorable decision. Unlike other standing requirements, which are judicially "self-imposed", the requirements above are constitutionally mandated by Article III. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

## INJURY

Plaintiffs in Area A allege that the VA's failure to administer its program to decrease the potential for resegregation deprived them of the benefits of living in a racially integrated and stable community. Plaintiffs in Area B allege that they are forced to live under the threat of resegregation. In addition, those in Area B claim that the rapid resegregation of Area A has prevented the orderly integration of Area B. The court found this to be true. The SCC claims that it lost members, resources and support as a result of the rapid resegregation. The SCC also claims derivative injury as a representative of its members.

The district court recognized, and defendants do not dispute, that deprivation of the benefits of living in a stable, racially integrated neighborhood is a distinct and palpable injury sufficient to satisfy the first element of standing. *See Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). The district also recognized a distinct and palpable injury to residents of Area B, from living under a threat of resegregation. The court found that the SCC could satisfy the injury element both derivatively and as an organization.

---

**6.** Below, the plaintiffs also challenged the VA's practice of using only two appraisers in the area, arguing that they took racial factors into account when evaluating the homes. The court found that plaintiffs had not shown a single instance of race being considered in a VA appraisal and that there was sufficient institutional oversight in the appraisal process to ensure that the individual appraisers would not have

unilateral control over the evaluations. In addition, plaintiffs had claimed that the VA's practice of encouraging mortgages in the inner-city was detrimental to orderly integration. The court found that there was no substantial change in VA policy which affected the resegregation process. These findings do not appear to be contested on appeal.

## CAUSATION

■ Plaintiffs alleged that the rapid resegregation of Area A was fairly traceable to the VA's failure to administer its loan program to promote integrated housing. Plaintiffs complain of the VA's failure to institute a prepurchase counseling program and its use of "John Doe" appraisals, which allow a seller to preapprove his house for a VA-assisted loan if an otherwise qualified purchaser is found.[7] These practices allowed for more rapid sales of houses than would have occurred with conventional financing alone, plaintiffs argue, and ensured that Area A would never stabilize as an integrated community. To satisfy the causation element of standing, plaintiffs had to show that had the VA instituted a prepurchase counseling plan and eliminated its use of John Doe appraisals, resegregation of Area A would not then have occurred, or would have occurred significantly less rapidly.[8]

Area B plaintiffs' injuries stem both from having to live adjacent to a resegregated community and from having to live under the threat of resegregation. To show that the threat of future resegregation is fairly traceable to the acts or omissions of the VA, Area B residents must show that the use of a prepurchase counseling program and tighter lending practices in the inner-city would eliminate or reduce this threat. Of course, if we find that the resegregation of Area A is not fairly traceable to the acts and omissions of the VA, then we must find that the threat of future resegregation in Area B cannot be traced to the VA.

Plaintiffs' burden to show causation is unusually heavy; in an area fraught with complex motivations and factors, plaintiffs must show that changing one or two factors would have substantially affected the result. As plaintiffs themselves concede, "one cannot separate out the factor of VA and FHA financing and speculate what would have happened without it." (Appellants' Brief p. 21–22). Unfortunately this is precisely what is required before judicial authority can be exercised.

*Acts Attributable to the VA Alone*

In determining causation, the district court examined only the practices of the VA. The original complaint named both HUD (through its FHA program) and the VA as defendants. The FHA was dismissed without prejudice from the suit when it agreed, among other things, to institute an experimental prepurchase counseling program in the Marquette Park area. Plaintiffs urge that looking at the VA program alone was error and that the cumulative effect of FHA and VA-assisted mortgages should have been assessed.

■ Borrowing from tort law, plaintiffs argue that if two actors are jointly responsible, settling with one defendant does not require the plaintiff to prove that the injuries were caused solely by the remaining defendant. *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979); RESTATEMENT (SECOND) OF TORTS § 431 (1965). Under a tort analysis, a plaintiff need show only that the remaining defendant was a "substantial factor" in the causal chain. *Edmonds*, 443 U.S. at 260, 99 S.Ct. at 2756. This is, in many ways, a false issue. The court did not require plaintiffs to show that the VA was the *sole* source of their injuries, the court held only that plaintiffs must show that their injuries were "fairly traceable" to the acts of the VA alone. Had the plaintiffs shown that the VA was a "substantial factor" in the causal chain, there is no basis for finding that that would not have sufficed. Instead, the district court concluded that monitoring and regulating the VA home loan guaranty program would not have made an appreciable difference in the rapid resegregation of

---

**7.** The VA no longer uses John Doe appraisals. Thus, with respect to Area B residents' "threat of future resegregation" claim, we must ignore the VA's appraisal policy.

**8.** In so requiring, we adopt the reasoning of the First Circuit in *Munoz-Mendoza v. Pierce,* 711 F.2d 421 (1st Cir.1983) to the extent that it held that even a sufficient acceleration of an otherwise inevitable loss of housing rights is nonetheless a cognizable injury for purposes of standing.

Area A. Thus, even borrowing from a tort analysis, the plaintiffs failed to show that the VA was sufficiently responsible for the injuries incurred to impose liability. We agree with the district court that the appropriate inquiry is whether the injuries were "fairly traceable" to the practices of the VA alone.[9]

■ What remains then, is the question of whether the rapid resegregation of Area A can be fairly traced to the VA's mortgage practices during the period in question. The district court found that the actual and direct cause of the resegregation in Area A was increased black demand for housing in the area, coupled with whites' fears of declining property values and "status" fears. This finding is not challenged on appeal. Thus, to trace their injuries to the practices of the VA, plaintiffs had to show that different practices would have substantially decreased blacks' demands for housing in the area *and* would have substantially decreased the phenomenon of "white flight". The district court found that had the VA changed its practices as plaintiffs suggest, it would not have affected whites' fears or black demand significantly. We are bound to accept this determination unless we conclude that it is "clearly erroneous." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 77, 98 S.Ct. 2620, 2632, 57 L.Ed.2d 595 (1978).

*Effect of VA Practices on Whites' Fears*

In concluding that the practices of the VA neither caused nor hastened resegregation, the district court did not consider the VA's practice of guaranteeing a mortgage on a given house even before a buyer is found, known as a "John Doe" appraisal. The court found that the plaintiffs had failed to produce any evidence "that a single white homeowner in Area A ever pro-

cured a John Doe appraisal in order to facilitate and accelerate the sale of his home." (Mem.Op. at 38). It is difficult to tell from this finding whether the district court found insufficient evidence that John Doe appraisals were used in Area A or whether the court believed that the seller's motive in securing a John Doe appraisal was necessary to establish the relevance of the appraisals. Plaintiffs submitted Exhibit 24, a multi-page document containing a partial list of VA appraisals in Area A in the years 1975 and 1976. Some listings include the amount of a "certificate of reasonable value" (CRV). According to plaintiffs, the absence of a CRV amount connotes that the particular VA appraisal is a "John Doe" appraisal commitment, secured before the VA received an application from a potential purchaser. In addition, plaintiffs submitted other evidence which could establish the general proposition that forward commitments were used in Area A during the period in question.

Although not conclusive, we believe that plaintiffs submitted sufficient evidence to support a finding that John Doe appraisals were used in Area A in the 1970's. In addition, we do not believe plaintiffs needed to show that sellers procured John Doe appraisals for the purpose of accelerating the sale of their homes. We therefore find the district court's finding in this regard puzzling. The VA's use of John Doe appraisals could go to prove two aspects of plaintiffs' case. First, if the acceleration caused by the appraisals substantially increased white fear and therefore flight, it could show that the VA actually caused resegregation. Second, if the appraisals sufficiently accelerated sales, it could support a finding that the VA hastened the inevitable resegregation. *See Munoz-Mendoza v. Pierce*, 711 F.2d 421 (1st Cir.1983).

---

**9.** To find standing based on the combined effects of VA and FHA financing would be especially offensive here, in light of the relief sought by plaintiffs. Plaintiffs seek to compel the VA to offer alternative housing to all those aggrieved. Having settled with the FHA, plaintiffs would have the VA redress all "injuries" caused by both agencies, i.e., any purchaser who had

secured either an FHA or a VA-assisted mortgage. The statistics show that the VA was the more minor player, compared to the FHA. In 1976, the year of the highest turnover in Area A, 61% of the homes sold were sold with government-assisted financing, but the VA was responsible for only 28% of those sold.

To compel either conclusion, however, plaintiffs would have to show specific data regarding the effect of John Doe appraisals in Area A. General testimony that John Doe appraisals *tend* to hasten sales would not allow the factfinder to conclude that such appraisals either caused or hastened resegregation. Plaintiffs, however, failed to present evidence to support the conclusion that any specific sale was accelerated by the use of a John Doe appraisal. Thus, although it may have been error for the court to require plaintiffs to show that sellers procured John Doe appraisals for the purpose of accelerating sales of their homes, any such error was harmless in light of plaintiffs' failure to show actual acceleration.

In a further attempt to demonstrate how VA practices exacerbated white flight, plaintiffs presented expert testimony that the uncounseled use of FHA and VA-assisted mortgages fed white fear that the neighborhood would undergo rapid resegregation. As proof the plaintiffs presented a lay-person's testimony that she associated rapid racial resegregation with FHA and VA-assisted financing. Plaintiffs attempted to show that white fears would be reduced with a more closely monitored VA home loan guaranty program. Plaintiff McManus testified that during the period of resegregation, VA and FHA financing "struck fear in the hearts of the people...." (Tr. 186) The district court found the fear insufficient to establish a causal link between the loan programs and resegregation. Although plaintiffs challenge this as an error of law, we find it is unquestionably a finding of fact, subject to the clearly erroneous standard.

█ The district court found that McManus' testimony had diminished credibility because of her participation in the lawsuit. McManus could not testify for the white community as a whole; McManus' testimony could, at most, establish only that certain members of the white community "associated" VA and FHA financing with resegregation. This is not enough to establish a causal connection. "Associating" government financing with resegrega-

tion is not inconsistent with Dr. Berry's theory that government financing is a symptom, rather than a cause, of resegregation. In addition, the court noted that to the extent that such fears were irrational and not grounded on any improper acts of the VA, those fears could not substantiate a finding of causation. Rather than ignore the causes of white's fears, as plaintiffs contend, the court found that the fears of resegregation were more plausibly related to the fact that the area immediately east of Area A had just undergone resegregation—and that the historic pattern of resegregation in the city has been south and west, in a block-by-block movement. Thus, we find that the district court's determination that VA practices did not significantly increase whites' fears was not clearly erroneous.

*Effect of VA Practices on Black Demand*

Plaintiffs submitted evidence to show that after the FHA instituted an experimental prepurchase counseling program, FHA-insured mortgages decreased significantly in the area. This, they argue, shows that prepurchase counseling reduces demand. The prepurchase counseling program was not necessarily responsible for the decrease in FHA-assisted mortgages in Area A. For one thing, by the time the FHA instituted its experimental program, most of the homes in Area A had already changed hands to black owners. In 1976, during the height of "white flight", 241 houses were sold with government assistance. In 1977, after the FHA began counseling, both FHA and VA-assisted mortgages decreased significantly. The decrease in FHA mortgages between 1977 and 1978 could have been due simply to a slower real estate market in general at the time.

In addition, the district court determined that in the absence of evidence to show that *conventional* mortgage options would have been unavailable during the period in question it could not find that any amount of prepurchase counseling would have affected whites' abilities to sell. In other words, even if the plaintiffs had shown that different VA practices could have reduced

black demand, it might mean very little without a concomitant decrease in "white flight."

The district court's finding that resegregation would have occurred even if the VA had monitored and regulated its loan program to reflect changing racial composition is not clearly erroneous. While the evidence presented demonstrated a "remote possibility" that different practices might have prevented resegregation, the district court was more than warranted in finding that such possibilities were too speculative to warrant a finding that the resegregation was "fairly traceable" to the actions of the defendant.[10] *See Hope, Inc. v. County of DuPage*, 738 F.2d 797, 806–08 (7th Cir. 1984).

The order of the district court dismissing the action for lack of subject matter jurisdiction is

AFFIRMED.

CUDAHY, *Circuit Judge*, concurring:

This is an unusual case in which the role of the district court as trier of fact seems to me so key that it would be extraordinarily difficult for an appellate court to reach a result contrary to the one reached below. *Cf. Munoz-Mendoza v. Pierce*, 711 F.2d 421 (1st Cir.1983). And the case presents a problem where the task of the trier of fact is in effect to evaluate the significance of policies. The question is: what is the impact, if any, of various administrative and business practices on a complex social phenomenon like resegregation; are the practices "symptoms" or "causes"? Although it is certainly possible on various points to disagree with the district court or with the majority, it would be difficult, given a problem of this sort, to conclude that the district court is so wrong as to merit reversal. *Cf. Hope, Inc. v. County of DuPage*, 738 F.2d 797, 817 (7th Cir.1984) (Cudahy, J., dissenting).

Thus, what conclusion can one draw about John Doe appraisals, a practice that logically would "tend" to hasten house sales, but which, in the view of the majority, was not shown to have caused or accelerated resegregation in Area A? *Supra* at 1426–27. It seems to me irrelevant that these appraisals are no longer used in Area B, *id.* at 1425 n. 7, since, of course, the Veterans Administration can reinstitute them at will. Because John Doe appraisals "tend" to speed up sales, the reimplementation of this practice in Area B might contribute to the future resegregation of that area. However, tracing the threat of resegregation to the potential use of John Doe appraisals in Area B may be too speculative a connection on which to base standing, especially given the apparent dearth of data on the effect such appraisals had in Area A.

With respect to uncounseled VA loans, the district court discounted the testimony of a white resident that the existence of the FHA and the VA loan assistance programs fuels whites' fears of resegregation. To the extent such fears do exist, the district court concluded they were "mistaken" because the evidence before the court did not establish a causal connection between VA-guaranteed financing and white flight. *Jorman v. Veterans Admin.*, 654 F.Supp. 748, 766 (N.D.Ill.1986). It is not clear to me why the *rationality* of the fears is relevant. A connection may be created simply through perceptions: if residents believe rapid racial change and VA-guaranteed loans are linked, these perceptions by themselves produce effects in the real world. But, of course, the district court did not find that even this connection existed. At the end of trial, the court remained "unconvinced that the availability of VA-guaranteed financing was a substantial factor in the creation of white residents' fears in Area A." *Id.*

Although I am not persuaded that the programs the plaintiffs seek are without

---

10. In *Allen*, 468 U.S. at 759–60, 104 S.Ct. at 3328–29 the Supreme Court emphasized the role that standing plays in the maintenance of the doctrine of separation of powers. The *Allen* Court noted that "suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations.... are rarely, if ever, appropriate for federal court adjudication."

value as antidotes to resegregation, I believe that, given the findings of the district court and the record developed below, we would not be justified in reaching a result different from that of the district court.[1]

1. I think that one of the plaintiffs' more formidable hurdles—but only as to Area A—is the apparent inadequacy of the record on remedies as they relate to redressability. The majority, of course, notes but does not rely on this point. *Supra* at 1423.