Jurellene **JORMAN, et al., Plaintiffs,**

v.

**VETERANS ADMINISTRATION, et al., Defendants.**

**No. 77 C 581.**

United States District Court, N.D. Illinois, E.D.

Sept. 11, 1986.

F. Willis Caruso, Isham Lincoln & Beale and Alexander Polikoff, Chicago, Ill., for plaintiffs.

Richard C. Stearns and Elizabeth R. Pugh, Dept. of Justice, Civil Div., Henry A. Cohn, Office of Gen. Counsel, Veterans Admin., Washington, D.C., and R. Lawrence Dessem, Knoxville, Tenn., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOLDERMAN, District Judge:

A. *Introduction.*

This litigation involves the socially sensitive and difficult issues of racial segregation and integration maintenance in the Marquette Park area of Chicago.[1] This case, pending since 1977, has been the subject of two prior published opinions authored by other judges of this district

---

1. "Marquette Park" is the common name for a community area on the southwest side of Chica- go that is officially designated as Chicago Lawn. (Tr. 75–78.)

court.[2] Plaintiffs contend that the defendants, the Veterans Administration of the United States and the Administrator of Veterans Affairs (collectively the "VA"), contributed to the rapid resegregation of a part of the Marquette Park area, and that the overwhelmingly black racial composition of this area threatens the racial, physical, economic and social stability of the geographic area immediately west of the resegregated neighborhood.[3] In particular, plaintiffs claim that the defendants' administration of the VA's home mortgage guaranty program "has caused or contributed to actual and threatened systematic racial transition (in the vernacular, 'white flight') in parts of Marquette Park, Chicago, in violation of VA's duty to promote fair housing under [the] Fair Housing Act of 1968...." *Jorman v. Veterans Administration, et al.,* 579 F.Supp. 1407, 1410 (N.D.Ill.1984).

Through the VA home loan program, the VA guarantees the home mortgages of qualified and credit-worthy veterans of the United States' armed services up to the amount of $27,500 or 60 percent of the loan, whichever is less. (Tr. 585–86, 686–87.) VA-guaranteed loans, therefore, reduce the risk a mortgage lender incurs when extending a mortgage loan to a home buyer and can significantly reduce the amount of down payment a borrower must make on the home he seeks to purchase. (Tr. 703, 822.)

This case proceeded to trial on December 9, 1985 on the issue of liability alone. The trial lasted through December 18, 1985 and closing arguments were heard on March 3, 1986. Based upon the evidence presented and for the reasons set forth below, the case is dismissed for lack of subject matter jurisdiction.

### B. *Background of the Litigation and the Parties.*

"This action was filed February 18, 1977 by 21 Marquette Park area plaintiffs against both VA and the United States Department of Housing and Urban Development and its Secretary (collectively 'HUD'). HUD was dismissed without prejudice [on] October 14, 1977 when it agreed, in connection with its Federal Housing Administration ('FHA') insured mortgage program, to institute a [prepurchase] counseling program intended to promote integration in housing.

"On October 3, 1978 plaintiffs filed their Amended Complaint (the 'Complaint'). Count I charged VA ... with failing to fulfill its affirmative duty to Marquette Park residents as imposed by Section 3608(c):

All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of [the Act, 42 U.S.C. §§ 3601–3619] and shall cooperate with the Secretary [of HUD] to further such purposes.

"Count II claimed VA had engaged in or condoned housing discrimination or racial steering [4] in violation of various provisions of the Act." 579 F.Supp. at 1410.

As a result of dismissals in 1982 and 1984, only Count I and four representative plaintiffs remain in the suit. The remaining plaintiffs are Jannis Moore Willaby ("Moore"), Mary Ceil McManus ("McManus"), Leonard Judickas ("Judickas")

---

**2.** *See Jorman v. Veterans Administration of the United States,* 500 F.Supp. 460 (N.D.Ill.1980) (Crowley, J.) (denying VA's motion to dismiss) and *Jorman v. Veterans Administration, et al.,* 579 F.Supp. 1407 (N.D.Ill.1984) (Shadur, J.) (denying the parties' cross-motions for summary judgment.)

Where appropriate, the Court has adopted and quoted from Judge Shadur's statement of facts, the entirety of which is found at 570 F.Supp. at 1410–1411. *See* Fed.R.Civ.Pro. 56(d).

**3.** In the context of this case, "resegregation" signifies a change in home ownership in a geographic area from all or mostly white homeowners to all or mostly black homeowners. (Tr. 71.)

**4.** " 'Racial steering' is the practice of directing prospective home purchasers to residences available in neighborhoods predominantly composed of people of purchasers' own race."

and the Southwest Community Congress ("SCC"). Plaintiffs Moore and McManus testified at the trial. Ms. McManus testified in her individual capacity and as the representative of the SCC.

For purposes of this litigation, plaintiffs have designated three geographic subsections of Marquette Park as "Area A," "Area B–1" and "Area B."

Area A is a roughly three block by twelve block area, bounded on the north by 63rd Street, on the east by railroad tracks, on the south by 74th Place, and on the west by Western Avenue. (Tr. 77.)

Plaintiff Moore, a black person, purchased her home at 6559 South Bell Avenue (within Area A) in August of 1976. Ms. Moore purchased her home with an FHA-insured mortgage. When Ms. Moore purchased her home, Area A was an integrated neighborhood. (Tr. 226.)

Area B–1 is an area adjacent to and immediately west of Area A of a size and shape roughly equivalent to that of Area A. Area B–1 was designated as a distinct geographic area by the plaintiffs for purposes of comparison and contrast with Area A. (Tr. 117.) None of the remaining plaintiffs resides in Area B–1.

The third geographic area, designated for purposes of this litigation as "Area B," is comprised of Area B–1 and most (but not all) of the remaining Marquette Park community. Area B is bounded on the east by Western Avenue, on the south by 75th Street, on the west by Cicero Avenue and on the north by 47th Street. (Tr. 78.) Plaintiffs McManus and Judickas are white residents of Area B. Both of these plaintiffs purchased their homes in 1959 and have lived in Area B most of their lives.

The SCC is a not-for-profit Illinois corporation with offices located within Area B. Although the SCC's offices are within Area B, it draws its membership from Area A, Area B and beyond. Its boundaries include over 12 square miles of the City of Chicago. (Tr. 206.) The SCC was founded in 1969 for the purposes, among others, of defusing community tensions and combating community deterioration. (Tr. 132–33.) The SCC is an umbrella organization whose membership is comprised of other community organizations. The SCC currently has approximately 130 member organizations. (Tr. 140.) At least two of the member organizations within the SCC have a predominantly black membership. (Tr. 140–41.)

### C. *The Nature of the Problem.*

Census data reveal the "tumultuous nature of white flight" in Area A during the years between 1970 and 1980. 579 F.Supp. at 1411. In 1970, of the 4,101 residents of Area A, only 2 were black. Pl.Ex. 20C. By 1980, however, Area A's population was comprised of 4,458 black residents and 535 white residents.[5]

Area B–1 did not undergo anywhere near the same degree of racial change between the two census takings. In 1970, Area B–1 had a total population of 5,194 persons, of whom only one person was black. In 1980, Area B–1 still had only 1 black resident out of a total of 5,043 persons. In 1980 28.9% of the population of Area B–1 was hispanic.[6]

In 1980, approximately seven and one-half percent of Area B's population was hispanic and less than one percent was black. Since the 1980 census, approximately 15 to 18 black families have moved into Area B. (Tr. 106–08.) Ms. McManus and one of plaintiffs' two experts, Kale Williams, testified that some of the property owned by these recent black residents of Area B has been victimized by violent acts, including firebombing. (Tr. 108–09; 189–90.)

Plaintiffs have submitted six sets of calculations that constitute the statistical un-

---

5. No data has been presented to the Court regarding changes in the racial composition of Area A or B–1 since 1980.

6. The record contains no evidence showing what percentage of Area B–1's population was hispanic at any time prior to 1980, but the parties appeared to agree that the hispanic population in Area B–1 has increased since 1970.

derpinnings of plaintiffs' claim against the VA.[7] The calculations (hereinafter referred to as the "Tables") are not disputed in this case. Between 1974 and 1980, the rate of homeownership turnover in Area A was 109.1%. During those seven years, the VA guaranteed a total of 24.2% of the mortgage loans on the homes sold in Area A. In 1976, HUD and the VA together insured (or guaranteed) almost 61% of the mortgages issued on homes sold in Area A. The VA alone financed 28% of the homes sold in Area A in 1976.

Area B-1, by contrast, experienced only a 48.5% rate of turnover in home ownership between 1974 and 1980. The VA guaranteed 12.2% of the mortgage loans made in Area B-1 during that time period. In 1976, when the VA guaranteed 28% of the mortgages on homes sold in Area A, it guaranteed only 6.8% of the mortgages on homes sold in Area B-1. As Judge Shadur noted, "Put another way, 1 in 10 homes in Area A changed hands with VA financing in 1976, while at the same time only 1 in 200 homes in Area B-1 changed hands with VA financing." 579 F.Supp. at 1411.

It is undisputed in this case that the VA does not collect or consider data regarding the impact of its home mortgage guaranty program on the racial composition of communities in which loans are being guaranteed. The VA has no method of ascertaining whether its mortgage guaranty program contributes to or hastens racial transition in a community, or whether all persons seeking loan guaranties for homes in a neighborhood are of a single race. Plaintiffs contend that under the Fair Housing Act of 1968, 42 U.S.C. § 3608(c) and the National Neighborhood Policy Act, 42 U.S.C. § 1441, the VA is required to collect and consider such data and to monitor and regulate the effects of its program on the integration or segregation of neighborhoods. *See, inter alia,* Complaint; ¶ 12, Tr. 1218.

Plaintiffs claim to have been injured by the VA's allegedly unlawful failure to so monitor and regulate the effect of its mortgage guaranty program. In particular, plaintiff Moore contends that the VA's failure to monitor and regulate the effect of its program led to the rapid resegregation of Area A, thereby depriving her of the benefits of living in an integrated and racially stable community.

The remaining plaintiffs' alleged injuries all stem from the effects of the rapid resegregation of Area A. Plaintiffs McManus and Judickas, although not living in Area A, claim that the VA's alleged violation of its fair housing duties in Area A has affected and continue to affect the quality of living in Area B. These plaintiffs maintain that the rapid resegregation of Area A threatens similar rapid resegration in Area B. This threat allegedly injures these plaintiffs because of the fear, tension and violence engendered thereby: plaintiffs are forced to live under the threat of a diminished quality of life and community deterioration. Plaintiffs McManus and Judickas also claim that the rapid resegregation of Area A has inhibited the orderly integration of Area B, thereby precluding the residents of Area B from living in a stably integrated community.

Finally, the SCC claims that the rapid resegregation of Area A caused the organization to lose substantial support and members, and required the SCC to divert resources to attempt to combat resegregation. (Tr. 153-54.)

D. *Evidence Regarding the Role of Government Financing in Rapid Resegregation.*

Defendants have claimed throughout this litigation that plaintiffs lacked standing to challenge the legality or illegality of the VA's home mortgage guaranty program. The most significant standing argument raised by defendants has been that plaintiffs have not shown that the VA's conduct

---

**7.** Earlier versions of these tables can be found as an appendix to Judge Shadur's opinion at 579 F.Supp. at 1419.

caused the injuries alleged in the complaint. As Judge Shadur explained in his opinion in this case, "[w]hile [plaintiffs'] statistics are undisputed except as to the manner of their presentation, the *correlation* they demonstrate does not in this case establish *causation*." 579 F.Supp. at 1413 (emphasis in original).

 In order to withstand dismissal on the basis of standing, plaintiffs were required to prove by a preponderance of the evidence that their injuries were fairly traceable to the VA's alleged failure to monitor and regulate the effect of its home mortgage guaranty program on the racial composition of Area A. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).[8]

Much of both the plaintiffs' and defendants' evidence at trial, therefore, was submitted to the Court for the purpose of establishing or refuting plaintiffs' assertion that the VA's administration of its loan guaranty program, and in particular the VA's failure to monitor and regulate the effect of its program, actually caused or hastened the rapid resegregation of Area A. Because the Court has decided that the evidence fails to establish the critical causal link between the VA's conduct (or lack thereof) and the plaintiffs' injury, the Court will review the evidence concerning causation in some detail.

Plaintiffs presented evidence supporting their contention that the VA's administration of its home mortgage guaranty program caused the rapid resegregation of Area A in three separate ways. The Court will examine each of these in turn.

1. *Infusion of VA-guaranteed mortgages as cause of rapid resegregation.*

First and foremost, plaintiffs contend that VA-guaranteed financing is a necessary "catalyst" to the occurrence of rapid resegregation in a community. (Tr. 1162.) In other words, but for the "infusion of unmonitored and unregulated" VA-guaranteed mortgages, plaintiffs argue, rapid resegregation could not have occurred in Area A. (Tr. 1252.)

Plaintiffs' principal witnesses for this theory of causation were plaintiffs' two experts, Kale Williams and Calvin Bradford.

Mr. Williams testified that his research, experience and observation have led him to conclude that resegregation occurs at a rapid pace when certain elements exist in a community. Mr. Williams identified these elements as: (1) an existing boundary between white and black communities; (2) apprehension and concern "on the white side" of the boundary; (3) initial moves by black families into the white neighborhood being met with threats, intimidation and violence; (4) a sharp increase in real estate activity, often involving discriminatory marketing and sales practices by realtors; and (5) a financing mechanism that allows for a high volume of sales in a short period of time. (Tr. 63–64, 110.)

According to Mr. Williams, what occurred in Area A was a "classic example" of rapid racial resegregation. (Tr. 85.) Most importantly for purposes of this case, Mr. Williams testified that VA-guaranteed and FHA-insured loans satisfied what he perceived to be the fifth element of the rapid resegregation phenomenon—i.e. a financing mechanism that paves the way for

---

**8.** The Court wants to emphasize that plaintiffs were required to prove that their injuries were fairly traceable to the VA's conduct, and not to the alleged cumulative effect of VA and FHA activity. At trial, plaintiffs consistently attempted to lump the VA and FHA programs together, maintaining that the programs were the "functional equivalents" of one another and that to separate the two in the context of this case was "completely silly." (Tr. 447–48.) *See also, inter*

*alia,* Tr. 425, 431, 432 and 444. The Court disagrees. After plaintiffs settled with HUD, their burden in this case was to establish that their injuries were fairly traceable to the conduct of the only remaining defendants, *i.e.* the VA and its Administrator. This Court simply cannot impose liability on the VA as a result of HUD's administration of the FHA mortgage insurance program.

rapid and high volume sales of real property. (Tr. 92.) According to Mr. Williams, if FHA-insured mortgages had been unavailable in Area A between 1974 and 1980, but VA-insured loans were still available, rapid resegregation nonetheless would have occurred. In other words, VA-financing alone was a sufficient vehicle for the occurrence of rapid resegregation of Area A. (Tr. 111.)

Plaintiffs' second and primary expert at trial was Calvin Bradford, Ph.D., presently a senior fellow at the Hubert Humphrey Institute of Public Affairs at the University of Minnesota. Dr. Bradford identified eight significant roleplayers in the housing market. Those players are seller, buyer, lender, realtor, appraiser, government insurer, mortgage buyer and mortgage banker. (Tr. 413–440.)

Dr. Bradford testified at length regarding the phenomenon of rapid resegregation, its occurence in Area A and the causal connection between the VA's home loan guaranty program and the resegregation. According to Dr. Bradford, the "rapid resegregation syndrome" is comprised of four elements "which describe[ ] the process of the rapid resegregation process, racial change in single-family neighborhoods." (Tr. 477.) The elements are: (1) the predominance or infusion of FHA or VA government loan programs in a racially-changing neighborhood; (2) the predominance of mortgage banking companies as the major lending agencies in the changing neighborhood; (3) a rapid or massive increase in the level of sales in the changing neighborhood; and (4) a very close relationship between the realtors selling in the changing neighborhood and individual mortgage lenders. (Tr. 477–78.)

Dr. Bradford testified that government-assisted lending is the "driving force" behind the syndrome. (Tr. 478.) In particular, it is the availability of "John Doe" appraisals (the VA's program) and conditional commitments (the FHA's program) that allows sales to proceed at an "extremely accelerated rate." (Tr. 529.) "John Doe" appraisals and conditional commitments are mechanisms by which the VA (John Doe appraisals) and FHA (conditional commitments) commit to guaranteeing or insuring a mortgage on a property usually before a buyer for the home has been secured by the potential seller. Both mechanisms contemplate, of course, that the value of the home be appraised and approved before the insurance commitment is extended by the governmental agency. (Tr. 446.)

According to Dr. Bradford, two changes in federal financing policy allowed the VA and HUD to become the engines by which the rapid resegregation syndrome can occur. First, as a result of pressures brought to bear primarily by civil rights organizations, HUD and the VA decided between 1965 and 1968 to encourage the use of their mortgage programs in minority-occupied inner city areas—areas in which such assistance had previously been denied or at least limited in availability. (Tr. 480–85; Plaintiffs' Exhibit 13G.) The second policy change, Dr. Bradford testified, was the emergence of the Federal National Mortgage Association ("Fannie Mae") as a quasi-private agency free to raise and produce capital in private markets. A rapidly expanding Fannie Mae, Dr. Bradford explained, meant that there existed a ready purchaser in the secondary mortgage market for VA-guaranteed and FHA-insured loans. According to Dr. Bradford, not until these two changes in federal policy were implemented did inner-city neighborhoods undergo extremely rapid rates of home turnover from white to black ownership. (Tr. 490.)

Dr. Bradford also testified specifically about the occurrence of the rapid resegregation syndrome in Area A. According to Dr. Bradford, all of the elements of the rapid resegregation syndrome existed in Area A between 1974 and 1980. Relying on the figures in the Tables, Dr. Bradford concluded that Area A was a racially changing neighborhood, and that the volume of sales between 1974 and 1980 was significantly higher than it had been between the years 1970 and 1974. (Tr. 504.) He also concluded that FHA and VA lend-

ing had been very substantial in Area A during the seven years he was asked to study, and noted that VA financing had peaked in Area A in the years 1976 and 1980.[9]

Dr. Bradford's research included a review of FHA-insured and VA-guaranteed loan documents on homes sold in the Marquette Park area. Dr. Bradford testified that 97 percent of those FHA-insured loan documents which he reviewed identified a mortgage banker as the lender in the transaction, and 76 percent of those VA-insured loan documents which he reviewed identified a mortgage banker as the lender in the transaction. (Tr. 503.) From this information Dr. Bradford concluded that the third element of the rapid resegregation syndrome, as he defined it—i.e., a predominance of mortgage bankers as lenders in a changing neighborhood—existed in Area A between 1974 and 1980.

Finally, Dr. Bradford concluded that between 1974 and 1980, realtors selling homes in Area A had established close relationships with lenders. (R. 509.) In sum, Dr. Bradford testified that all of the elements of rapid resegregation syndrome were present in Area A between 1974 and 1980.[10]

Dr. Bradford was asked his opinion about the cause of rapid resegregation in Area A:

Q. Dr. Bradford, as an expert who has studied the rapid resegregation syndrome and the data in this case, do you have an opinion as to what caused the syndrome in Area A?

A. Yes.

Q. What is that opinion?

A. It's my opinion that the rapid resegregation syndrome was caused by the infusion of FHA and VA lending in that area.

Q. How can you tell that? What do you base that opinion on?

A. I base the opinion on the analysis which we have just reviewed here, the high level of FHA and VA lending in the neighborhood, high levels independently for each of the programs in relationship to their proportions of the general existing housing market, close relationships with the mortgage lenders, and close relations with the realtors, and the extremely high volume of sales.

The critical element to the rapid resegregation is that we are talking here about a process of extremely rapid change, not an evolutionary change, not a normal market change, but a rapid change, and we have these huge volumes of sales associated with the FHA and VA lending process.

Q. Dr. Bradford, in your opinion, is there anything else that could have caused the syndrome in Area A?

A. In my opinion, again referring to the rapid rate of this change, in my experience in looking at the single family home sales market and the process of racial change, not in my experience.

Q. In your opinion, could the rapid resegregation syndrome have occurred in Area A in the absence of FHA financing, that is, with VA financing alone.

A. It is my opinion that it could have operated through that agency alone, yes.

Q. And what do you base that opinion on?

A. Well, again, I base that opinion on the existing evidence which is here and the role VA played after this substantial reduction of FHA lending in this period, and in the policies which exist in the Veterans Administration, policy to encourage lending, specifically in innercity areas, as opposed to encouraging metropolitanwide lending or lending in all areas.

That's what I base my opinion on. (Tr. 515–16.)

To refute Dr. Bradford's conclusions, the VA submitted the expert testimony of Bri-

---

**9.** The 1976 peak represents a more significant statistic for plaintiffs since by 1980 the number of homes being sold had declined to its lowest level since before 1974.

**10.** Dr. Bradford has not reviewed any post–1980 data concerning either Area A or Area B–1. (Tr. 514.)

an Berry, Ph.D., currently the Dean of the School of Urban and Public Affairs at Carnegie-Mellon University. Dr. Berry testified that racial change occurred in Area A according to the "historic pattern of racial change" in the city of Chicago, *i.e.* block by block "in a wavelike movement." (Tr. 899.) According to census maps submitted by the defendants, after the end of World War I and continuing through 1980, resegregation of communities from white residents to black residents has occurred in Chicago along two axes—west along Roosevelt Road and south along State Street. Dr. Berry testified that the community area just east of Area A underwent rapid racial change in the decade between 1950 and 1960. (Tr. 906–07; Defendants' Ex. 82.) Area A, therefore, would be the next neighborhood that, according to historical precedent, could have been predicted to undergo rapid racial resegregation.

Dr. Berry was asked, based upon his studies of racial changes in housing ownership in Chicago, to explain what the causes of such changes were. Dr. Berry explained that his research has led him to believe that the sources of racial change lie in (1) "the mechanisms of the housing market"; and (2) the "particular attitudes of white residents to prospective entry of black residents into their neighborhoods...." (Tr. 916.)

By "mechanisms of the housing market," Dr. Berry explained, he signified the interaction between demand and supply in the available housing market. In the 1970's, Dr. Berry testified, growing numbers of black households with more income led to increased demand by the black community for better housing. (Tr. 916–18.) Because job opportunities for blacks were concentrated in the city during this time period and because housing opportunities for blacks in the suburbs were limited, upwardly mobile blacks sought better housing opportunities in the city. (Tr. 1034.)

The "supply response" to similar growing demands for housing among white households was to deliver an overabundance of new housing units in the suburbs. As whites vacated the central cities for the suburbs, black homeseekers occupied the housing left behind by whites. Dr. Berry explained, "The net result of that [process] was a wholesale relocation of the black community into areas that newly became available, and produced, at the opposite end of the housing surpluses in the suburbs, produced the abandonment and the population decline in the traditional areas of black occupancy in the central city." (Tr. 917–18.)

White residents' attitudes towards prospective black residents in their community, Dr. Berry testified, accounts for the rapidity of the resegregation process. Dr. Berry testified:

The reason for the very rapid ... transition of areas in this wavelike, block-by-block manner, I believe to reside in what I call whites' status fears, which color their attitude to integration, and this is the belief in a large segment of the white community that the entry of blacks into that community will cause a decline in the perceived social status of that community in the eyes of others, and therefore, that if they remain as residents of that community, they will be perceived to have also suffered a loss in social status as a consequence of black entry into the community, so that it is the status threat that precipitates, on the one hand, attempts to constrain or prevent change, and, on the other hand, the rapid departure of whites in relatively short periods of time if they believe that the change is taking place and they cannot contain it. (Tr. 918–19.)

Dr. Berry testified that his research has led him to conclude that whites are willing to tolerate an 80%–20% ratio of white to black residents in a community. Black homeseekers, on the other hand, view a 50%–50% ratio as ideal. The problem precipitated by this "80–20, 50–50 dilemma," Dr. Berry testified, is that "if blacks move into an area and drive towards the 50–50 balance, then they move beyond the 80–20 desirable number for whites, and the whites' status fears begin to take over

then, which precipitates—which precipitates withdrawal." (Tr. 921.)

Dr. Berry testified that these sources of racial change were present in areas of south and southwest Chicago during the 1970s. (Tr. 921.)

Dr. Berry was asked to give his opinion regarding the testimony of Dr. Bradford, plaintiffs' expert, concerning FHA and VA-guaranteed financing as one of the primary causes of racial change in Area A. Dr. Berry testified:

> I don't believe that [Dr. Bradford] has really identified causes of change. The factors that he lists tend to be symptoms rather than causes. To state that one of the causes is a rapid rate of turnover is basically a tautology, because rapid change is defined as rapid—as many properties changing hands....

(Tr. 922.)

Dr. Berry also disagreed with Dr. Bradford's conclusion that rapid racial change would not have occurred in Area A but for the availability of VA-guaranteed mortgages. Since at least 56% of the mortgage loans made in Area A from 1974 through 1980 were through conventional means, Dr. Berry reasoned, Area A would have changed to at least 60% black through conventional loans alone.[11]

On cross-examination, Dr. Berry was questioned about this conclusion:

> Q. ... If it is true that there must be financing available [in order for home sales to take place] and conventional mortgages, at least in Austin, for example, and, as alleged here, in Marquette Park, became harder to obtain, then if FHA and VA were not available, there could be no rapid racial transition, isn't that correct.
>
> A. Yes, if you accept your—yes, I mean if you accept all of your premises. If there's less money available to borrow,

then you have less houses sold. But you have to accept all of your premises then. (Tr. 966.)

Dr. Berry was also cross-examined about the ramifications of his "80–20, 50–50 dilemma":

> Q. Going back to your 80–20, 50–50 dilemma, isn't it correct that the 44 percent FHA and VA would be plenty, because if 20 percent went black under the dilemma, it would have changed the neighborhood, anyway?
>
> A. Yes, that's consistent with—yes.

(Tr. 1036–37.)

Finally, on direct examination Dr. Berry was asked about the threat of racial resegregation in Areas B and B–1. As an initial matter, Dr. Berry disagreed with plaintiffs' contention that the presence of a significant number of hispanic residents in Area B–1 may be a precursor to rapid racial change from white to black in Area B or Area B–1. (Pl.Ex. 20C, Request to Admit No. 51; Tr. 1159.) Although Dr. Berry concluded that the hispanic population in these areas is likely to grow, his studies indicated that historically in Chicago a predominantly hispanic population is not a forerunner to rapid black influx in a community. (Tr. 937–38.) The presence or absence of a growing hispanic population in Area B–1, therefore, did not have any effect on the likelihood of rapid racial change from white to black in Areas B–1 or B. (Tr. 937.)

Dr. Berry also testified that another factor has significantly affected the likelihood of Areas B–1 and B undergoing rapid racial change. Although the historical movement of the black population in Chicago has been directly south and west on a block-by-block basis, between the late 1970s and into the 1980s a change occurred in the pattern of black homebuying. According to Dr. Berry, housing opportunities for black homeseekers opened up very significantly in Chicago's suburban areas dur-

---

**11.** Dr. Berry reasoned that 56% of conventional mortgage loans would have resulted in at least 60% black residency because not all of the loans made by conventional means were for single family, single unit residences but rather for duplexes and other multi-unit buildings. (Tr. 924.)

ing this time period, with the result that for the first time "the black suburban population increase exceeded the black population increase in the central city." (Tr. 933.) This "defusing of pressures," according to Dr. Berry reduces the likelihood of rapid racial change in Areas B and B–1. (Tr. 934.)

Aside from Dr. Berry's testimony, the VA presented evidence to refute Dr. Bradford's assertions that a significant change in VA lending policy for inner-city areas occurred in the late 1960s or early 1970s. According to defense witnesses Pedigo and Giblin, the VA's policy on mortgage guaranties on homes in the inner-city did not change significantly at that time. (Tr. 678, 693.) Mr. Giblin, president of the Midwest Mortgage Services in Glen Ellyn, Illinois, testified that he recalled that after 1968 there was a "reminder" from the VA that redlining, the process of excluding certain geographic areas from loan consideration and approval, was not allowed under VA policy and that there "may have been small elements of additional liberalization in terms of the inner-city, simply because it was an important issue at the time." (Tr. 709–10.) But according to Giblin, the VA's policy has always been that "if the veteran wants to buy a house, we want to guarantee it, if we can." (Tr. 692.)

Finally, the VA offered Mr. Pedigo's testimony as an alternative explanation of why the number of VA loans in Area A may have risen after 1974. According to Mr. Pedigo, currently the Loan Guaranty Officer of the VA's Regional Office in Chicago, legislative changes in 1970 and 1974 made VA benefits available to a large number of previously-unentitled veterans and extended the period during which VA benefits were available to veterans. (Tr. 1189, 1192.) No evidence was submitted, however, regarding whether the volume of VA-guaranteed loan activity actually increased as a result of these legislative changes, or whether and how the legislative changes specifically would have affected loan activity in Area A.

### 2. *VA appraisal practices as a cause of rapid resegregation.*

Plaintiffs' second theory of causation was that the VA's appraisal practices caused, or at least contributed to, the rapid resegregation of Area A.

Dr. Bradford testified, and plaintiffs' exhibit 13–BB shows, that 75% of all VA appraisals conducted on homes sold with VA–guaranteed mortgages in Area A between 1974 and 1980 were conducted by two VA fee appraisers.[12] One fee appraiser alone accounted for more than half of the appraisals of homes on which VA-guaranties were eventually extended.[13] Dr. Bradford testified regarding what he perceived to be the problem with using only two appraisers in a small geographic area:

> The problem here is in the nature of the appraisal process, itself, related to the use of only a few appraisers. Since, as I mentioned before, an appraiser is supposed to determine the fair market value, it's not supposed to be a biased estimate, but different appraisers may have different views about what affects value, and those values are used—in this case, those are the values that are used against which loans are made. So they tend to set the sale price.
>
> That wouldn't have any adverse effect on a market, or any market effect, normally, if a large number of appraisers were used. If they tended to have different sets of values and different personal biases or opinions, they would cancel out, as we would say, they would randomize, as a researcher would say.

---

**12.** Actually, Exhibit 13–BB accounts for only 280 of the 284 VA-guaranteed mortgages in Area A between 1974 and 1980. *Compare* Exhibit 13–BB and the Tables.

**13.** VA fee appraisers are not employees of the VA, but rather are independent appraisers who, as discussed *infra,* receive a certain amount of training from the VA in order to do VA appraisal work. (Tr. 586–87.) Usually, the veteran-borrower pays for the appraisal done by the fee appraiser.

But when you have one or two appraisers accounting for half, or, in this case, three-quarters of the market, then there is a chance that those appraisers' personal opinions about value can begin to determine the trends in the area.

(Tr. 513–14.)

Plaintiffs also maintained that VA fee appraisers set the value of homes in Area A lower than they would have been set had the VA fee appraisers not considered race.[14] According to plaintiffs' witness Woltjen, VA appraisers take into account neighborhood racial change when doing appraisals and set the values downward accordingly. (Tr. 329.)

Mr. Woltjen's testimony was supported by that of another plaintiffs' witnesses, Dexter MacBride, formerly an appraiser with the California Department of Public Works. Mr. MacBride testified that it is "an established, ingrained principle" of the appraisal profession for appraisers to take into account neighborhood racial change when doing appraisals. (Tr. 1088.) According to Mr. MacBride, up until 1977 standard real estate textbooks included a "principle of conformity" in appraisal valuations. According to Mr. MacBride's interpretation of this principle, "[m]aximum value applies to those properties which conform, in which there is a homogeneity, not only in architecture, but also in race, in social standards.... [T]hose properties which are not reasonably homogeneous in race and nationality are diminished in value." (Tr. 1084.) Dr. Bradford also testified that from 1932 until at least 1976 a principle that racial homogeneity increase property values permeated the appraisal industry. (Tr. 470–473.)

On cross-examination, Mr. MacBride admitted that he knows of no appraisers, VA or otherwise, that ever appraised property in the Marquette Park area of Chicago. He "know[s] nothing about the area, none of the appraisers." (Tr. 1123.) Mr. MacBride was unable to offer any testimony,

moreover, as to whether the VA appraisers who conducted appraisals in Area A were ever schooled in or adhered to this "principle of conformity."

The VA presented evidence to contradict plaintiffs' assertions regarding VA appraisal practices. According to the testimony of Richard Hult, the VA's chief of loan guaranty appraisals from 1974 until 1984, VA policy at least since 1953 has been that race is not a factor that may influence property valuation by a VA fee appraiser. (Tr. 287.) Mr. Pedigo confirmed that during his tenure at the VA, which began in 1971, the VA's policy has been that race has "absolutely no place in making determinations of reasonable value." (Tr. 594.)

The VA's appraisal form requires the fee appraiser to certify that, in arriving at the estimated value of a home, he has not "'been influenced in any manner whatsoever by the race, color, religion, national origin, or sex of any person residing in the property or in the neighborhood wherein it is located.'" (Tr. 286, Defendants' Ex. 20.) Mr. Pedigo was unaware of any VA fee appraiser who has violated or been found to have violated this certification since 1968. (Tr. 674.)

Mr. Pedigo explained why only a few VA fee appraisers are assigned to a certain geographic area, *i.e.* why only two appraisers conducted 75% of the appraisals in Area A. The VA's position is that an appraiser will do a good job "only if he limits himself to a certain geographic area of the state." (Tr. 592.) Although most appraisals in a geographic area are conducted by a limited number of appraisers, each appraisal is assigned for review according to the terminal digit of the loan number to one of six staff appraisers who are employed by the VA at its regional office. The six staff appraisers review appraisals on any property within the entire state of Illinois, and no one staff appraiser is responsible for appraisals from any particular geographic area of the state. (Tr. 599.) The staff appraiser "reviews the

---

**14.** However, plaintiffs stipulated that they had no evidence of any violation of the fair housing laws by any VA fee appraiser. (Tr. 659, 664–65.)

[fee] appraiser's report, scrutinizes the comparable properties, comparing them to the subject property,.... determines generally that the form has been completed as required," then makes the final decision as to what the reasonable value of the property should be. (Tr. 598.) Finally, the VA regional office conducts an on-site inspection of 10% of the properties appraised by the independent fee appraisers in order to determine whether the fee appraisers properly appraised the property and properly evaluated the "comparables" used to set the value of the property. (Tr. 598–99.)

Mr. Pedigo testified that an appraiser who qualifies to do VA appraisal work receives special training in VA appraisal procedures. All the VA forms and directives concerning appraisals are reviewed and the independent appraiser is required to return yearly for a review course. (Tr. 592.)

Finally, the defendants called William H. Metz, the president of a real estate appraising and counseling company. Mr. Metz was asked his opinion regarding Dr. Bradford's conclusion that appraisers set value trends in communities. Mr. Metz disagreed and stated:

Appraisers do not set trends. They interpret the trends that are taking place in the marketplace by complete analysis of what is actually happening within that area, based upon the data available to him and the sales and so forth.

(Tr. 770.)

Mr. Metz was also questioned regarding the "principle of conformity" which, according to plaintiffs' witnesses Bradford and MacBride, led to the lowering of housing values in a racially diverse neighborhood:

Q. Professor Bradford also discussed what he called the principle of conformity. Did you hear that testimony, sir?

A. Yes, I did.

Q. Would you agree or disagree with Professor Bradford's interpretation of that principle? Would you agree or disagree?

A. I would disagree.

Q. Why is that, sir?

A. He stated one minor portion of that principle. The principle of conformity has to do within the appraisal industry with the conformity of dwellings, social economic status, and this sort of thing, so as to maintain the maximum dollar amounts.

It means—what they are saying there is you shouldn't have a $20,000 home in the same area as a $200,000 home. You shouldn't have a single family home in an industrial park.

They are talking about conformity, style, age, that sort of thing, to maintain the optimum value.

(Tr. 770–71.)

3. *Perceptions regarding VA financing as a cause of rapid resegregation.*

The third (and most nebulous) causal link which plaintiffs attempted to establish between the VA and rapid resegregation in Area A concerned white residents' fears and perceptions concerning VA-guaranteed financing. According to plaintiff McManus, realtors selling homes in Area A between 1974 and 1980 heavily advertised the availability of VA and FHA financing. (Tr. 147.) In Ms. McManus' opinion, "when you talked about FHA or VA financing" during this period, "it struck fear into the hearts of the people as to what would happen if FHA and VA financing were allowed to continue." (Tr. 186.)

Dr. Bradford also testified regarding the effect of white residents' perceptions on rapid racial turnover. According to Bradford, the availability of government financing as a means toward rapid sales "feeds people's perception that their neighborhood will undergo racial resegregation...." (Tr. 1158.)

## DISCUSSION

As an "incident" to the "bedrock requirement" that federal jurisdiction be exercised only " 'to adjudge the legal rights of litigants in actual controversies,' " the Supreme Court has always required that a litigant have standing to challenge the ac-

tion sought to be adjudicated in the lawsuit. *Valley Forge Christian College v. American United For Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982), *quoting Liverpool S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885). In *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court again emphasized the critical role that the doctrine of standing plays in defining the limits of federal judicial power. Justice O'Connor, writing for the majority in *Allen*, reiterated the three constitutional components of the standing doctrine as they have developed in the case law. First, the injury alleged to have been suffered by the plaintiff must be " 'distinct and palpable' " and not " 'abstract' or 'conjectural' or 'hypothetical.' " *Allen, supra*, 104 S.Ct. at 3325, *quoting Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *and O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). Next, the injury must be fairly traceable to the challenged conduct of the defendants. Finally, relief from the injury must be likely to follow from a favorable decision. *Allen, supra*, 104 S.Ct. at 3325, *citing Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924–25, 48 L.Ed.2d 450 (1976). The Court will examine each of these requirements within the context of this case.

### A. *Distinct and Palpable Injury.*

■ Plaintiffs have asserted four injuries which they believe satisfy the injury-in-fact element of standing. The Court has concluded that the evidence supports three of plaintiffs' injury claims.

The Court believes that the evidence establishes that plaintiffs Moore, McManus and Judickas are deprived of the benefits of living in a stable, racially integrated neighborhood. It is uncontested that Area A, the community in which Ms. Moore resides, is populated almost entirely with black residents. Area B, by contrast, is almost entirely white. The Supreme Court has recognized that deprivation of the "social and professional advantages of living in an integrated community" is a cognizable injury sufficient to provide standing. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 112, 99 S.Ct. 1601, 1614, 60 L.Ed.2d 66 (1979).

The Court also believes that plaintiffs Judickas and McManus live in a community that is threatened with resegregation and that this threat is sufficiently "real and immediate" to meet standing requirements. *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). Both Dr. Bradford and Dr. Berry agreed that resegregation has occurred in Chicago in a block-by-block, "wavelike" process. Even though, as Dr. Berry testified and the Court believes, the opening up of housing opportunities in the south suburbs of the city has defused the threat of racial resegregation in Area B somewhat, the Court nevertheless has concluded that residents of Area A live under a significantly greater threat that their community will undergo rapid racial change than residents of a community that does not border on an entirely black neighborhood. Although the evidence about racial change or the threat thereof between 1980 and the date of trial was virtually nonexistent, the Court considers that the experts' testimony regarding the historical process of racial resegregation in Chicago suffices to create the inference, unrebutted, that the threat to Area B continued to exist throughout the period of this litigation.

■ Next, the Court believes that the evidence established that the SCC has suffered sufficient organizational injury to satisfy the initial standing element.[15]

---

**15.** The SCC's standing is also derivative of the standing of the individual plaintiffs. *See Jor-*

*man,* 579 F.Supp. 1407, 1414 n. 16.

Plaintiff McManus, the designated representative of the SCC at trial, testified that between 1974 and the end of 1979 the SCC lost a number of member organizations. (Tr. 155.) In fact, Ms. McManus testified, the SCC suffered such a loss of contributions that the future of the organization was threatened. (Tr. 156.) The SCC spent valuable resources in block organizing and recruiting members. (Tr. 154.)

The Supreme Court has held that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources —" constitutes an injury in fact sufficient to meet the first element of Article III's standing requirement. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

Finally, the Court reaches the most obscure of plaintiffs' injury claims and one with which the Court has had some difficulty. Plaintiffs assert that:

> VA's failure to monitor and regulate the effects of its program on rapid resegregation has caused the plaintiffs the very harm Congress meant to protect them against.

(Tr. 1219.)

The language of this injury claim derives from the First Circuit's opinion in *Munoz-Mendoza v. Pierce*, 711 F.2d 421 (1st Cir. 1983). *See* Tr. 1219. In *Munoz-Mendoza*, plaintiffs were minority residents of a Boston neighborhood who challenged HUD's decision to grant a $19 million urban development grant to assist in the development of a commercial complex. Plaintiffs maintained that construction of the complex would limit housing opportunities for low-income and minority residents in nearby neighborhoods. Plaintiffs argued that HUD's decision to grant the $19 million was unlawful because HUD failed to follow proper procedures in approving the grant. In particular, the *Munoz-Mendoza* plaintiffs claimed that Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968 and other related HUD regulations required HUD to conduct a more thorough study than it had on the

effect of the HUD grant on the racial integration of nearby neighborhoods. 711 F.2d at 424. The district court dismissed the complaint for lack of subject matter jurisdiction, holding that the plaintiffs had not adequately shown that the HUD grant would cause the injuries of which they complained. The First Circuit reversed in part and remanded the case for further consideration.

In discussing the *second* element of standing, *i.e.* the causation element, the First Circuit addressed defendants' argument that plaintiffs had failed to establish the causal link between HUD's failure to conduct a more thorough study and the threatened harm of minority displacement and racial segregation. Defendants argued that the causal link was missing "because the displacement and racial segregation at issue depend[ed] upon the voluntary actions of private parties, such as landlords who must individually and separately decide to raise their rents." 711 F.2d at 429. The First Circuit rejected this "third party intervention" theory stating:

> This argument may be relevant to the substantive legal question of whether the statute and regulations are to be interpreted as the plaintiffs argue, but it is not material to the question of standing. The plaintiffs' basic claim is that the statutes and regulations oblige HUD not to give a UDAG without studying how third parties like landlords are likely to react and what the effect on residential integration is likely to be. If the plaintiffs are wrong on this substantive argument, they have no claim on the merits. If they are right, however, the involvement of third parties is no answer to their standing claim, *for they would have suffered the very harm that Congress meant to protect against.*

711 F.2d at 429 (emphasis added).

Relying on this language, plaintiffs in the case *sub judice* contend that they have suffered the "very harm that Congress meant to protect against" as an injury separate and distinct from their other injury claims. Plaintiffs nowhere define, how-

ever, exactly what this harm is that they have suffered and from which Congress meant to protect them.

After studying the First Circuit's opinion in *Munoz-Mendoza,* this Court is convinced that the Appellate Court was not recognizing any distinct type of injury that satisfied the injury-in-fact element of standing. The "very harm" suffered or threatened to be suffered by the *Munoz-Mendoza* plaintiffs was the minority displacement and racial segregation referred to earlier in the paragraph under review. In fact, earlier in the opinion the First Circuit explicitly held that the threat of increased racial segregation was the only injury claim asserted by the *Munoz-Mendoza* plaintiffs sufficient to satisfy the injury-in-fact element of the standing doctrine. 711 F.2d at 426.

In sum, the Court believes that plaintiffs Moore, McManus and Judickas have been deprived of the benefits of living in a racially integrated area, and that plaintiffs McManus and Judickas live under a heightened threat that their community will undergo rapid racial segregation. The SCC too has satisfied the actual injury element of standing since its standing is derivative of the plaintiffs' and since its very existence was threatened by the resegregation of Area A.

### B. *The "Fairly Traceable" Requirement.*

■ The Court now turns to what has been a major stumbling block for the plaintiffs throughout this litigation—and what this Court concludes is the fatal stumbling block—the question of whether the VA's administration of its mortgage guaranty program caused plaintiffs' injuries. The plaintiffs were required to demonstrate at trial that absent the VA's failure to monitor and regulate the effects of its program, there is a substantial probability that Area A would not have undergone the rapid resegregation it experienced between 1974 and 1980. *Warth v. Seldin,* 422 U.S. 490, 504, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975); *Hope, Inc. v. County of Du Page, Ill.,* 738 F.2d 797, 806–08 (7th Cir.1984).

In *Allen v. Wright, supra,* the Supreme Court offered further guidance regarding what must be shown in order to establish the causation element of standing. In *Allen* parents of black public school children alleged that their children had been denied the right to receive a desegregated education as a result of the Internal Revenue Service's failure to adopt sufficient standards and procedures to fulfill its obligation to deny tax-exempt status to private schools which discriminated on the basis of race. In determining that plaintiffs had failed to sufficiently establish the requisite causal link the Court explained:

> The diminished ability of respondents' children to receive a desegregated education would be fairly traceable to unlawful IRS grants of tax exemptions only if there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public-school integration.

104 S.Ct. at 3328. The Court continued:

> It is, first, uncertain how many racially discriminatory private schools are in fact receiving tax exemptions. Moreover, it is entirely speculative, as respondents themselves conceded in the Court of Appeals, whether withdrawal of a tax exemption from any particular school would lead the school to change its policies. It is just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status. It is also pure speculation whether, in a particular community, a large enough number of the numerous relevant school officials and parents would reach decisions that collectively would have a significant impact on the racial composition of the public schools.

*Id.* at 3328–29 (footnote and citations omitted).

■ This Court has concluded that the evidence fails to demonstrate that monitoring and regulating the VA home loan guaranty program would have made an appreciable difference in the rapid resegregation of Area A. For the Court to conclude otherwise would require the Court to engage in the speculative leaps of faith prohibited by the Supreme Court in *Allen* and *Simon, supra* ("unadorned speculation will not suffice to invoke the federal judicial power"), *quoted in Hope, supra*, 738 F.2d at 811.

Plaintiffs' position throughout this litigation has been "that VA's conduct was an essential element in an exceptionally rapid racial transition that led to nearly total resegregation, something that would not have happened at that pace and to that extent but for VA's activities." Plaintiffs' Mem. Opposing Defendants' Motion for Summary Judgment, p. 18. Several gaps in plaintiffs' evidence, however, preclude the Court from concurring with plaintiffs' conclusions regarding the causal link between the VA's conduct and the rapid resegregation of Area A. The Court will again examine each of plaintiffs' three causation arguments in turn.

1. *Infusion of VA-guaranteed mortgages.*

As explained above, plaintiffs' first and primary argument with regard to causation is that the infusion of VA financing into Area A directly caused the rapid resegregation of Area A.

Plaintiffs contend that the forward commitment feature of the VA guaranty program, the so-called "John Doe appraisal," was the key element of the VA's program that made possible the rapid pace of home sales in Area A. Plaintiffs were unable to produce any evidence, however, that a single white homeowner in Area A ever procured a John Doe appraisal in order to facilitate and accelerate the sale of his home. There is no evidence, therefore, that John Doe appraisals played any role whatsoever in the rapid racial transition of Area A.

Next, plaintiffs maintained that a significant change in VA guaranty policies in 1968 paved the way for rampant financing of homes in inner-city neighborhoods. The VA, together with HUD, "provide[d] the unmonitored, unlimited availability of mortgage money essential to rapid resegregation" in the inner city, "and thus create[d] the unique opportunity for mortgage bankers and realtors to link up and exploit racism." Plaintiffs' Mem. Opposing Defendants' Motion for Summary Judgment, p. 19.

Even if the Court assumes that the 1968 VA memorandum advising against excluding inner-city areas from VA guaranties represented a significant shift in policy which encouraged the use of VA guaranties in inner-city areas, plaintiffs have been unable to explain why Area A did not begin to undergo rapid racial change until 1974, approximately 6 years after the alleged shift in policy. The causal connection between the policy change and VA financing in Area A is undermined by this gap in time. The upsurge of applicants for VA loans in Area A in the mid–1970s may as well be due to the return of a significant number of black Vietnam War veterans looking for homes (a point upon which no evidence was presented), or to legislative changes broadening the number of veterans entitled to benefits and the time period during which VA benefits could be used (a point on which unrebutted evidence was presented) as to the opening up of VA guaranties to inner-city housing areas in 1968.

The Court is unconvinced, however, that the 1968 memorandum represented a significant shift in VA policy. The Court found the testimony of defense witnesses Pedigo and Giblin to be highly credible, and that although the memorandum may have represented a slight "liberalization" in policy, it did not result in any significant change in the number of loans being guaranteed by the VA. (Tr. 710.)

Finally, plaintiffs' contention that the VA provided the unlimited mortgage money essential to rapid resegregation requires the Court to conclude that conventional mort-

gage money was unavailable to home-seekers in Area A between 1974 and 1980. This point was brought home most clearly during the cross-examination of Dr. Berry, during which he was asked whether (a) if conventional financing became difficult to obtain; and (b) if VA and FHA financing were not available, then rapid racial transition could not occur. Dr. Berry admitted that "[i]f there's less money available, then you have less houses sold. But you have to accept all of your premises then." (Tr. 966.) Plaintiffs produced no evidence, however, that conventional mortgages were difficult to obtain in Area A during the time period in question. Plaintiffs did not show that had VA mortgages been unavailable to black homeseekers in Area A, these homeseekers would not have sought and been able to qualify for conventional mortgages to finance the home of their choice in the Area A community.

Most importantly, the Court is convinced that the explanation of the causes of rapid resegregation proffered by the defendants' expert Dr. Berry is significantly more plausible than that offered by the plaintiffs' experts. The Court believes that the "causes" identified by plaintiffs' expert Dr. Bradford are indeed symptoms of or conditions that are present when a neighborhood is undergoing rapid racial turnover. The presence of an increased level of government financing of home mortgages may indeed be one of these symptoms or conditions. But the Court believes that the causes of rapid white flight lie fundamentally in the attitudes of white homeowners who fear neighborhood instability and deterioration and, in Dr. Berry's terms, "loss of status" when the level of black residents in a neighborhood exceeds a certain level. The Court also concludes that the market mechanism explained by Dr. Berry—that upwardly mobile blacks sought better housing within the city and that suburban developers had provided attractive home options to fleeing whites—provides the only explanation in this case of why 97% of the homeseekers in Area A during the relevant time period were black.

Finally, the Court recognizes that Dr. Berry's "80–20, 50–50 dilemma" is only a partial model explaining precipitous white flight in Area A. For example, the model fails to account for the precipitous rise in housing turnover in Area A between 1974 and 1976. During this time period, the rate of housing turnover went from a 5% rate in 1974 to almost 37% in 1976, and between 96% and 97% of the homes sold were sold to new black buyers. In other words, Dr. Berry's model does not account for the very rapid sale of the initial 20% of white-owned homes in Area A to black home buyers. Other undetermined (and unproven) factors must influence whether and to what extent a neighborhood that is from 0% to 20% black quickly goes over Dr. Berry's 20% threshold, thereby accelerating white flight, proceeds over the 20% mark at a normal pace, or stabilizes indefinitely at an acceptable-to-whites level of integration.

The failure of the model to explain all phenomena, however, does not render the model useless or invalid. In particular, the Court concurs with Dr. Berry's conclusion that, even had *no* VA guaranties been extended to black homebuyers in Area A between 1974 and 1980, racial resegregation would have occurred nonetheless at almost the same pace. According to Dr. Berry, since at least 56% of the homes sold in Area A between 1974 and 1980 were sold through conventional financing, the population of the neighborhood would have changed to at least 60% black during that time frame through sales by conventional means alone. *See* n. 11, *supra.* If the level of FHA financing is added to this percentage, at least 75–80% of Area A would have undergone racial change between 1974 and 1980. *Cf.* n. 8, *supra.* According to Dr. Berry's model, therefore, white flight would have occurred quite rapidly as the community became increasingly black because of whites' fear and intolerance of a significant level of black residency. The Court concurs with this reasoning. A sufficient amount of housing turnover from white to black ownership would have occurred irrespective of the VA home loan

guaranty program such that Area A would have undergone racial resegregation between 1974 and 1980 even had the VA not guaranteed a single home mortgage in Area A.

### 2. VA appraisal practices.

Plaintiffs' second argument regarding the causal link between the VA and rapid resegregation of Area A concerned the effect of the VA's appraisal practices on the community.

The Court has concluded that the evidence failed to establish that the VA's appraisal practices were a causal element in the rapid racial transition of Area A. Although the evidence is undisputed that two VA fee appraisers appraised approximately 75% of the homes sold with VA-guaranteed mortgages between 1974 and 1980, the evidence also established that these appraisals were reviewed by VA staff appraisers with state-wide jurisdiction and that 10% of the appraisals were thoroughly verified by on-site inspection. Plaintiffs' argument that two appraisers were insufficient to assure a randomization of opinions regarding housing values, therefore, is refuted by the fact that all of the appraisals were reviewed and approved by non-Area A specific staff appraisers.

Moreover, plaintiffs were unable to show that any VA fee appraiser ever considered the race of the buyer or seller, or the racial composition of Area A, in determining the reasonable value of any property in Area A. Plaintiffs presented no evidence to establish that the VA fee appraisers working in Area A adhered to or believed in a principle that racial homogeneity is a factor which adds value to homes in a neighborhood, or even that the VA appraisers read any textbooks concerning or belonged to any organizations that adhered to such a tenet. Furthermore, plaintiffs presented no evidence establishing that the VA fee appraisers considered the level of VA financing in Area A when determining the value of property therein.

In sum, the Court has concluded that the evidence presented by plaintiffs to establish a causal connection between plaintiffs' injuries and VA appraisal practices is insufficient to establish such a connection.

### 3. Perceptions regarding VA financing.

Plaintiffs also presented evidence that the mere availability of VA-guaranteed financing precipitated white flight in Area A. White residents apparently equated VA-guaranteed financing with very rapid racial turnover and, believing therefore that complete racial change was inevitable, sold out and fled.

The Court believes that, even if white residents feared that VA-guaranteed financing assured rapid racial change in Area A, such fears alone are insufficient to establish a causal link between the VA's conduct and racial transition in Area A. If the white residents' fears about the causal connection between rapid racial change and VA-guaranteed financing were mistaken, as the evidence in this case establishes, the VA cannot be held responsible for those fears. Plaintiffs had to show a causal connection between what the VA did and their injuries, and the Court believes that the VA did nothing to cause the white residents' fears besides exist.

Moreover, the Court remains unconvinced that the availability of VA-guaranteed financing was a substantial factor in the creation of white residents' fears in Area A. The evidence supports the conclusion that, although the presence of the VA may have contributed to the creation of whites' fears of rapid racial change, other factors played a more determinative role. For example, the historic pattern of racial transition in housing in Chicago has been south and west. (Tr. 902–04.) The community directly east of Area A changed from almost 0% black in 1950 to approximately 95% black in 1960. (Defendants' Ex. 82.) From those two facts alone, white residents of Area A may have feared that their community would be the next to undergo racial transition, and that the change would occur within a very short period of time.

In sum, in order to conclude that the VA's administration of its home loan guaranty program made an appreciable difference in the rapid resegregation of Area A, this Court would be forced to speculate that had the VA monitored and regulated the effect of its program in Area A, white homeowners in the community would not have decided to sell their homes and move elsewhere. The Court would also need to speculate that the monitoring and regulation of the VA program would have had a sizeable effect on the market of homeseekers in Area A, which the uncontroverted evidence in this case established was almost 97% black. The Court believes that the evidence fails to establish anything more than a "remote possibility" that the racial change in Area A would not have proceeded at the same pace and to the same extent but for the VA's failure to monitor and regulate its home loan guaranty program. Such a "remote possibility" is insufficient to establish the causal element of standing. *Hope, supra,* 738 F.2d at 811.

In support of their argument on causation, plaintiffs rely principally upon *Munoz-Mendoza v. Pierce,* 711 F.2d 421 (1st Cir. 1983), the facts of which are related at pp. 762–63 of this opinion. In *Munoz-Mendoza,* the defendants successfully argued at trial that plaintiffs had failed to satisfy the "fairly traceable" element of causation. The defendants did not dispute that the commercial complex to be built with the funds from the HUD urban development grant would lead to increased housing demand and increased rents. The defendants claimed and the trial court in *Munoz-Mendoza* agreed, however, that the process of "gentrification" would have led to the Boston community's being redeveloped and rent increases even had the commercial complex not been built, *i.e.* that the commercial complex was not a "necessary condition" for rent increases.[16] The district court reasoned:

> Copley Place is but part of a larger continuing pattern of development in and around the South End area of Boston. This considerable property development has undeniably generated an increase in area property values, which in turn has contributed to dramatic increases in the cost of rental housing in the area, which, of course, has a significant impact on those, like the plaintiff here, whose incomes may not be sufficient to meet those increases. Combined with other factors ... the continuing property development and increase in the property values are sure to continue whether or not Copley Place is completed or becomes the success its developers hope it will be.

*Quoted* at 711 F.2d at 427.

The First Circuit disagreed and concluded:

> It is as this point that we part company with the district court. We do not doubt the correctness of its conclusion that "upgrading" and rent increases will continue whether or not Copley Place is built. But we do not see how it can be concluded, on the basis of the record, that upgrading and rent increases would continue at anything like the same pace and in anything like the same amounts in Copley Place's absence. The Copley Place project is a $450 million undertaking, which its developers expect will create over 6,000 permanent jobs in downtown Boston. It cannot seriously be contended that a commercial complex of this scale will not create a material impact on housing demand in neighborhoods adjacent to it. It is also impossible for us to believe—without record evidence—that, had the HUD grant been denied, some other project or set of projects, waiting in the wings, would soon have stepped forward and taken its place. The record does suggest that $450 million projects in a midtown urban area take considerable time and effort to assemble—in this case, at least five years. The record provides no suggestion that a project similar to Copley Place could have been put togeth-

---

**16.** The defendants in *Munoz-Mendoza* apparently did not dispute that rent increases would lead to the injury alleged in that case, *i.e.* minority displacement and racial segregation in nearby neighborhoods. 711 F.2d at 427–28.

er in less than five years. We do not see how to avoid the conclusion that Copley Place at least will cause several additional years of higher rents and more displacement than would have occurred in its absence.

711 F.2d at 427 (citation omitted).

Relying on the First Circuit's determination in *Munoz-Mendoza* that accelerating the pace and volume of development was sufficient to establish the causal link between the HUD's urban development grant and rapid upgrading and rent increases, plaintiffs here argue that VA's acceleration of the pace and volume of home turnover in Area A is sufficient to satisfy the causal element of standing.

The Court disagrees. First, as explained at length above, the Court does not believe that the evidence adequately establishes that the VA home mortgage guaranty program significantly accelerated the pace at which resegregation occurred in Area A or the volume of homes that were sold between 1974 and 1980 by white residents in that community. In other words, unlike the situation in *Munoz-Mendoza*, the Court is not convinced that the VA program alone had a "material impact" on the rapid racial resegregation of Area A.

Moreover, another reason justifies differentiating this case from *Munoz-Mendoza*. In *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court explained that "the idea of separation of powers" underlies the "fairly traceable" element of standing doctrine. 104 S.Ct. at 3329. To find, as plaintiffs requested in *Allen*, that plaintiffs' children were unable to receive a desegregated education because of unlawful IRS grants of tax exemptions, the Court explained, "would pave the way generally for suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations." *Id.* "Such suits," the Court advised, "even when premised on allegations of several instances of violations of law, are rarely if

ever appropriate for federal court adjudication." *Id.*

■ This guidance from the Supreme Court appears to dictate a finding that the Court lacks jurisdiction over the subject matter of this suit. Plaintiffs here challenge the particular program the VA established to carry out its statutory obligations to veterans of the United States' armed services. The proper "monitor" of the VA's administration of its statutory obligation is Congress, not this Court, and any obligation to collect and consider racial data about the neighborhoods in which VA loan guaranties are being made should be imposed by the legislative body of the federal government. *See id.*

### C. *The Redressability Requirement.*

■ The third minimum constitutional requirement of standing is that plaintiffs' injuries must be likely to be redressed by a favorable decision. *Valley Forge Christian College v. American United*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). When the relief requested by plaintiffs is simply the cessation of allegedly illegal conduct, the redressability analysis is nearly identical to the "fairly traceable" analysis. *See Allen, supra*, 104 S.Ct. at 3329 n. 24. Here, however, plaintiffs request that this Court find that the VA has a duty to monitor and regulate the effect of its home loan guaranty program on the racial integration and stability of those communities in which mortgage guaranties are being extended. The redressability analysis in this case, therefore, properly focuses on the issue of whether such monitoring and regulation would relieve the injuries sustained by the plaintiffs in this case. *See Allen, supra*, 104 S.Ct. at 3326 n. 19.

With regard to plaintiff Moore's injuries, the Court believes that plaintiffs have not established that there is a substantial probability that the requested change in VA procedures would have an effect upon the nearly total resegregation of Area A. Even if the VA were able, through a prepurchase counselling program similar to

that implemented by HUD, to convince black homeseekers to purchase homes in more racially diverse communities, the Court remains sadly unconvinced that white homeseekers would choose to purchase a home in Area A. Perhaps most telling in this regard is the testimony by plaintiff McManus, an ardent supporter of racial equality in housing, that she would not even consider purchasing a home in Area A today. (Tr. 202–03.)

With regard to the injury suffered by plaintiffs Judickas and McManus residing in Area B, the Court observes that monitoring and regulating the effect of VA's mortgage guaranty program may have some effect on the pace and stability of integration in this community. The effect would undoubtedly depend upon such factors as the current level of housing turnover in Area B and the number of homeseekers who are applying for VA benefits, about which there was no testimony at trial. It is undisputed in this case, however, that after the implementation of HUD's prepurchase counselling program, the volume of sales consummated in Area A with FHA-insured mortgages declined dramatically. *See* Tables, Table # 2 (years 1977 and 1978). A VA prepurchase counselling program, even if it counselled only a few homeseekers, may provide residents of Area A with a confidence-building tool such that the white residents may come to believe that they can "contain" the process of resegregation. (Tr. 918–19.) Assuming (without deciding) that VA lending is at a significant level in Area B, or would climb to a significant level as more blacks sought housing in Area B, monitoring and regulating the effects of the mortgage guaranty program at the very inception of the integration process may aid the process of stable and peaceful integration in the Marquette Park community.

Although the Court has speculated regarding the possible effects of VA monitoring and regulation of its home mortgage guaranty program in Area B, this speculation is an insufficient basis upon which to found a determination that plaintiffs' injuries are redressable through judicial intervention. *See, e.g., Linda R.S. v. Richard*

*D. and Texas et al.*, 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973) (speculation about prospect of future relief insufficient to satisfy standing requirement). In the absence of adequate proof regarding (1) the current level of VA-guaranty activity in Area B; (2) the effect of the requested injunctive relief on the perceptions of white homeowners or black homeseekers in Area B; and (3) the connection between white residents' belief that rapid resegregation can be contained and their willingness to stay in a changing neighborhood, the Court is unable to conclude that plaintiffs' injuries would be redressable through the relief requested in this lawsuit.

### Conclusion

This case presented all of the problems of litigation that has lingered in the judicial system for almost eight years before being tried. The original complaint was filed at the point when housing turnover in Area A from whites to blacks was at its peak. Plaintiffs, undoubtedly eager to prevent total resegregation from occurring, filed suit and, in fact, achieved an early settlement with HUD. By the time the case against VA came to trial, however, the resegregation of Area A was virtually complete, many of the original plaintiffs had moved away from the community altogether, and the remaining plaintiffs were faced with the task of proving that the VA's program alone had made an "appreciable difference" in the resegregation process. The Court concludes that plaintiffs were unable to establish this critical causal link and so, at this late stage, the case must be dismissed for lack of subject matter jurisdiction.

### JUDGMENT

IT IS ORDERED AND ADJUDGED that the plaintiffs take nothing, that the action be dismissed on the merits and that the defendants recover of the plaintiffs their costs of action.